**BELLSOUTH TELECOMMUNICATIONS, INCORPORATED, Plaintiff–Appellee,**

v.

Jo Anne SANFORD, Chairman; Robert V. Owens, Jr.; Sam J. Ervin, IV; Lorinzo L. Joyner; Howard N. Lee; William Thomas Culpepper, II; James Y.

Kerr, II, Commissioners, in their official capacities as Commissioners of the North Carolina Utilities Commission, Defendants–Appellants,

and

North Carolina Utilities Commission; Robert K. Kroger, Commissioner, Defendants,

Image Access, Incorporated, Intervenor/Defendant.

No. 06–1678.

United States Court of Appeals, Fourth Circuit.

Argued: March 14, 2007.

Decided: July 25, 2007.

**ARGUED:** Margaret A. Force, Assistant Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellants. Matthew Patrick McGuire, Nelson, Mullins, Riley & Scarborough, L.L.P., Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy Cooper, North Carolina Attorney General, Raleigh, North Carolina, for Appellants. Frank A. Hirsch, Jr., Nelson, Mullins, Riley & Scarborough, L.L.P., Raleigh, North Carolina, for Appellee.

Before WILLIAMS, Chief Judge, NIEMEYER, Circuit Judge, and T.S. ELLIS, III, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Senior Judge ELLIS joined. Chief Judge WILLIAMS wrote a separate opinion concurring in part and in the judgment.

## OPINION

NIEMEYER, Circuit Judge:

With the purpose of creating competition in the provision of local telecommunications services, the Telecommunications Act of 1996 imposed new duties on incumbent providers, who had previously enjoyed monopolies in local markets for those services. Among the new duties was the duty to sell their services at wholesale to would-be competitors for resale to consumers. *See* 47 U.S.C. § 251(c)(4). The wholesale rate for such services was prescribed to be the incumbent provider's retail rate less a wholesale discount determined by the relevant state utility commission. *Id.* § 252(d)(3).

By two orders dated December 22, 2004, and June 3, 2005, the North Carolina Utili-

ties Commission ("NC Commission") determined, under the authority of 47 U.S.C. § 252(d)(3), that the value of an incumbent provider's incentive offers to subscribers, such as gift cards and cash rebates, when extended to subscribers for more than 90 days, created a promotional retail rate that must be offered to would-be competitors, less a wholesale discount.

Challenging the NC Commission's orders, BellSouth Telecommunications, Inc., an incumbent provider of telecommunications services, commenced this action in the district court under 47 U.S.C. § 252(e)(6). The district court declared the NC Commission's orders invalid, holding that an incumbent provider's incentives to retail subscribers, other than direct reductions in price, need not be taken into account in calculating the wholesale rate to be charged would-be competitors.

In this appeal, we conclude that the NC Commission correctly ruled that "long-term promotional offerings offered to customers in the marketplace for a period of time exceeding 90 days have the effect of changing the actual retail rate to which a wholesale requirement or discount must be applied." *See* 47 U.S.C. § 251(c)(4); 47 C.F.R. § 51.613(a), (b). Accordingly, we reverse the judgment of the district court and remand with instructions to enter summary judgment in favor of the Commissioners of the NC Commission.

I

In the spring of 2004, BellSouth Telecommunications, Inc., an incumbent pro-vider of telecommunications services to retail subscribers in North Carolina, made a filing with the NC Commission to introduce an incentive for subscribers which offers "a coupon for a check for $100 as an incentive to subscribe to one or more regular residence lines and two or more features." This "1FR + 2 Cash Back" offer, as it was called, required subscribers to return the coupon to BellSouth within 90 days to receive their checks. The offer was to run for nine months—from June 29, 2004, through March 31, 2005. In its filing, BellSouth indicated that it would not provide the benefit of this special offer to competing providers of telecommunications services under 47 U.S.C. § 251(c)(4).

Concerned that such incentive offers could be used to circumvent the resale requirements of the Telecommunications Act, the Public Staff of the NC Commission[1] filed a motion with the NC Commission for a ruling that gift offers, such as BellSouth's "1FR + 2 Cash Back" offer, are "special promotions of telecommunications services under federal law which must be offered to resellers if the special offer runs for more than 90 days."

After giving public notice and receiving comments, the NC Commission issued an "Order Ruling on Motion Regarding Promotions," dated December 22, 2004.[2] In its order, the Commission determined that incentives such as those proposed by Bell-South decreased the retail rate for the purpose of calculating the wholesale rate, because retail customers effectively paid less for their telephone service in the amount of the incentives. As a result, it

1. The Public Staff of the NC Commission is an independent arm of the Commission responsible for representing consumers in matters before the Commission. The Public Staff is not supervised by the Commission, but rather by an executive director appointed by the Governor. *See* N.C. Gen.Stat. § 62–15.

2. *In re Implementation of Session Law 2003–91, Senate Bill 814 Titled "An Act to Clarify the Law Regarding Competitive and Deregulated Offerings of Telecommunications Services,"* N.C. Utilities Comm'n, Docket No. P–100, Sub 72b (Dec. 22, 2004) (Order Ruling on Motion Regarding Promotions).

concluded that BellSouth was required to pass on the value of such incentives as a price reduction when selling its services to resellers, unless it could show that such restrictions on resale were "reasonable and nondiscriminatory." The NC Commission explained:

> While these promotional offerings are not discount service offerings *per se* because they do not result in a reduction of the tariffed retail price charged for the regulated service at the heart of the offerings, they do result in a savings to the customers who subscribe to the regulated service.... The promotion reduces the subscriber's cost for the service by the value received in the form of a gift card or other giveaway. The tariffed retail rate would, in essence, no longer exist, as the tariffed price minus the value of the gift card received for subscribing to the regulated service, i.e. the promotional rate, would become the "real" retail rate. Thus, the [incumbent provider] could use the promotion as a *de facto* rate change without changing its tariff pricing.

The Commission concluded that because the incentives reduced the retail rate for consumers, BellSouth had to pass on the value of the incentives to resellers.

With respect to the "1FR + 2 Cash Back" offer that prompted the order, however, the Commission observed generally that some promotions, even if they extended for more than 90 days, might be proven to be reasonable and nondiscriminatory and therefore would not have to be offered to resellers. As a result, it "would be inclined to find that [the 1FR + 2 Cash Back promotion] is reasonable and nondiscriminatory.... [T]he anti-competitive effects caused by a nine-month promotion that is unavailable to resellers are outweighed by the pro-competitive effects." The Commission was quick to point out, however, that resellers had not complained to the Commission nor asked it to find BellSouth's refusal to resell the promotion unreasonable or harmful to competition and that therefore it was not specifically ruling on that matter.

On BellSouth's motion for reconsideration, the NC Commission issued an order dated June 3, 2005, clarifying its December 22 order.[3] It noted that while the value of a promotion must be factored into the retail rate for the purposes of determining a wholesale rate for would-be competitors, the promotion *itself* need not be provided to would-be competitors. The NC Commission stated:

> The [December 22] *Order* does not require that non-telecommunications services, such as gift cards, check coupons, or merchandise, be resold. Such items do, however, have economic value. In recognition of this fact, the *Order* requires that telecommunications services subject to the resale obligation of Section 251(c)(4) be resold at rates that give resellers the benefit of the change in rate brought about by offering one-time incentives for more than 90 days. The *Order* does not require [incumbent providers] to provide [would-be competitors] with toasters, phones, knife sets, hotel accommodations, gift cards, *etc.* that they might provide to their customers as an incentive to purchase services. The *Order* does require that the price lowering impact of any such 90–day–plus promotions on the real tariff or retail list price be determined and that the benefit

---

3. *In re Implementation of Session Law 2003–91, Senate Bill 814 Titled "An Act to Clarify the Law Regarding Competitive and Deregulated Offerings of Telecommunications Services,"* N.C. Utilities Comm'n, Docket No. P–100, Sub 72b (June 5, 2005) (Order Clarifying Ruling on Promotions and Denying Motions for Reconsideration and Stay).

of such a reduction be passed on to resellers by applying the wholesale discount to the lower actual retail price. The NC Commission thus clarified that incentives function as retail price reductions which must be passed on to resellers. The June 3 order also clarified that even though incentives resulted in a reduced retail rate for purposes of calculating the wholesale price, BellSouth could still attempt, on a promotion-by-promotion basis, to justify any given restriction on resale as reasonable and nondiscriminatory and thereby avoid having to pass the incentive along to a would-be competitor.

BellSouth commenced this action against the NC Commission and the individual Commissioners (generally collectively, the "NC Commission") under 47 U.S.C. § 252(e)(6), requesting the district court to enter declaratory and injunctive relief against the NC Commission's orders.[4] Specifically, BellSouth challenged, as violating federal law, the NC Commission's determination that the value of one-time marketing incentives lasting more than 90 days must be accounted for as a reduction of the retail rate.

On cross-motions for summary judgment, the district court declared the NC Commission's orders invalid and granted summary judgment for BellSouth. It held that because incentives such as gift cards were not "telecommunications services" under 47 U.S.C. § 251(c)(4), they were not the subject of an incumbent provider's resale duty. It also concluded that the incentives were not "price discounts" under the regulations requiring incumbent providers to pass on discounts and promotions to competing providers. Thus, the court concluded that BellSouth had no obligation to give the value of the incentives to competing providers when selling them telecommunications services.

From the district court's judgment, the NC Commission filed this appeal.

## II

In enacting the Telecommunications Act of 1996, Congress intended to create competition in local telecommunications markets. Specifically, the Telecommunications Act was intended to force incumbent providers of local telecommunications services—"incumbent local exchange carriers" or "incumbent LECs"—which had regional monopolies over the local telephone infrastructure, to open their markets to competition. See Peter W. Huber et al., *Federal Telecommunications Law* § 1.9, at 54 (2d ed.1999). Because the local telephone monopolies controlled the physical networks necessary to provide telecommunications service, the Telecommunications Act created a series of compulsory licenses from the incumbent LECs to would-be competitors or "competitive LECs." Among other duties imposed by the Telecommunications Act, the incumbent LEC must "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A). This provision allows a competitive LEC to establish a market presence by reselling the incumbent's telecommunications services without building its own physical infrastructure. In selling telecommunications services to a competitive LEC, an incumbent LEC has a duty "not to prohibit, and not to impose unreasonable or discriminatory conditions or

---

4. While BellSouth originally named the North Carolina Utilities Commission as a defendant, along with the Commissioners, it subsequently dismissed the Commission and elected to proceed only against the Commissioners under the theory of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

limitations on, the resale of such telecommunications service." *Id.* § 251(c)(4)(B). The incumbent LEC must charge the competitive LEC a *wholesale rate* for the telecommunications service. "For purposes of section 251(c)(4), a *State commission* shall determine whole-sale rates on the basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier."[5] *Id.* § 252(d)(3) (emphasis added). Thus, the wholesale rate consists of the retail rate, less whatever costs the incumbent LEC will save by selling the services in bulk to the competitive LEC. Because the wholesale rate is calculated on the basis of the retail rate, a proper determination of the retail rate is essential to creating competition through the Telecommunication Act's resale provisions.

The Federal Communications Commission ("FCC") has promulgated regulations refining the resale obligations imposed by the Telecommunications Act. Thus, when an incumbent LEC offers telecommunications services to a competitive LEC at a wholesale rate, *see* 47 C.F.R. § 51.605(a), it does so subject to *id.* § 51.605(e), which provides that the "incumbent LEC shall not impose *restrictions* on the resale by [a competitive LEC] of telecommunication services offered by the incumbent LEC" (emphasis added). Section 51.613, however, provides three exceptions to the rule prohibiting restrictions. *First,* the incumbent LEC can prohibit cross-class selling—i.e. it can prevent the competitive LEC from buying *business* services and reselling them to *residential* customers. 47 C.F.R. § 51.613(a)(1). *Second,* the in-

cumbent LEC can restrict the resale of services offered at promotional rates, but only if those rates are in effect for less than 90 days. *Id.* § 51.613(a)(2)(i) ("An incumbent LEC shall apply the wholesale discount to the ordinary rate for a retail service rather than a special promotional rate only if such promotions involve rates that will be in effect for no more than 90 days"). If promotions are offered for longer than 90 days, the incumbent LEC must offer the promotional rates to its competitors. *Third,* the incumbent LEC can impose any restrictions that it can "prove[e] to the state commission" are "reasonable and nondiscriminatory." *Id.* § 51.613(b).

Finally, the FCC adopted rules to implement the resale requirements of the Telecommunications Act and the regulations promulgated under it, issuing a "First Report and Order" in August 1996. *See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 11 FCC Rcd. 15,499 (1996) (First Report and Order) (hereinafter "Local Competition Order"). In its Local Competition Order, the FCC stated that "[t]he rules that [it] establishes in this Report and Order are minimum requirements upon which the states may build." *Id.* ¶ 24.

Before adopting the Local Competition Order, the FCC considered numerous comments from interested parties, including contentions by incumbent LECs that "promotions and discounts are only devices for marketing underlying 'telecommunication services'" and that the promotions were not themselves telecommunications services required to be resold under 47 U.S.C. § 251(c)(4). *See* Local Competition Order ¶ 941. These incumbent providers

---

5. For purposes of calculating the wholesale rate for BellSouth to charge, the NC Commission has adopted a uniform discount rate of

21.5% from BellSouth's retail price for residential services, and 17.6% from its retail price for business services.

argued also that promotions and discounts were simply means "by which incumbent LECs differentiate their services from resellers' offerings." *Id.* ¶ 942. After considering these and other similar comments, the FCC concluded:

> Section 251(c)(4) provides that incumbent LECs must offer for resale at wholesale rates "any telecommunications service" that the carrier provides at retail to noncarrier subscribers. This language makes no exception for promotional or discounted offerings, including contract and other customer-specific offerings. We therefore conclude that no basis exists for creating a general exemption from the wholesale requirement for all promotional or discount service offerings made by incumbent LECs. A contrary result would permit incumbent LECs to avoid the statutory resale obligation by shifting their customers to nonstandard offerings, thereby eviscerating the resale provisions of the 1996 Act.

*Id.* ¶ 948. Nonetheless, the FCC observed that *short term* promotions serve "pro-competitive ends through enhanced marketing." Thus, it tempered its Order to exclude short-term promotions:

> There remains, however, the question of whether all short-term promotional prices are "retail rates" for purposes of calculating wholesale rates pursuant to section 252(d)(3). The 1996 Act does not define "retail rate;" nor is there any indication that Congress considered the issue. In view of this ambiguity, we conclude that "retail rate" should be interpreted in light of the pro-competitive policies underlying the 1996 Act. We recognize that promotions that are limited in length may serve pro-competitive ends through enhancing marketing and sales-based competition and we do not wish to unnecessarily restrict such offer-

ings. We believe that, if promotions are of limited duration, their pro-competitive effects will outweigh any potential anti-competitive effects. We therefore conclude that short-term promotional prices do not constitute retail rates for the underlying services and are thus not subject to the wholesale rate obligation.

Local Competition Order ¶ 949. In addition to its ruling that promotional and discount prices generally were to be treated as "retail rates" which incumbent LECs must offer to their would-be competitors, the FCC observed that short-term promotions can be pro-competitive marketing tools. It therefore "establish[ed] a *presumption* that promotional prices offered for a period of 90 days or less need not be offered at a discount to resellers. Promotional offerings greater than 90 days in duration must be offered for resale at wholesale rates pursuant to section 251(c)(4)(A)." Local Competition Order ¶ 950; *see also* 47 C.F.R. § 51.613(a)(2).

Applying these provisions of the Telecommunications Act, the regulations under it, and the FCC's Local Competition Order to the question of whether gift card type promotions must be taken into account in calculating the retail rate, the NC Commission concluded in its order of December 22, 2004:

> Despite the [incumbent LECs'] argument that gift card type promotions are incentives and/or marketing tools used to distinguish their services in the marketplace, these promotions are in fact promotional offerings subject to the FCC's rules on promotions. While these promotional offerings are not discount service offerings *per se* because they do not result in a reduction of the tariffed retail price charged for the regulated service at the heart of the offerings, they do result in a savings to the customers who subscribe to the regulat-

ed service. The longer such promotion is offered, the more likely the savings will undercut the tariffed retail rate and the promotional rate becomes the "real" retail rate available in the marketplace. The NC Commission therefore ruled that incumbent providers' offers of incentives to subscribers in the form of "gift cards, checks, coupons for checks or similar types of benefits," offered for more than 90 days, must be made available to resellers in the form of a reduced wholesale price.

In declaring the NC Commission's orders invalid, the district court advanced two reasons why the orders were inconsistent with the Telecommunications Act. *First,* the district court relied on the following syllogism: (1) 47 U.S.C. § 251(c)(4) requires an incumbent LEC to resell "any telecommunications service" that it provides; (2) gift cards, checks, coupons and similar types of incentives are not "telecommunications services"; therefore (3) the incumbent LEC does not have to provide the benefit of gift cards, checks, coupons and similar types of incentives to competitive LECs. *Second,* the district court recognized that the FCC "has determined [in its Local Competition Order] that the Act's resale obligations extend to *promotional price discounts* offered in retail on retail communications services." Reading a *price discount* not to include "marketing incentives," the court held that marketing incentives "such as Walmart [sic] gift cards" are therefore excluded from the FCC's Local Competition Order requiring that incumbent LECs pass on price discounts to competitive LECs. The court explained:

> A customer receiving a Walmart [sic] gift card in exchange for signing up to receive certain services, for example,

will pay the same full tariff price for the service each month as customers who subscribed to the service without the benefit of the gift card. Moreover, a customer cannot use a Walmart gift card or coupon to pay her bill.

The question presented on appeal, then, is whether the district court erred as a matter of law in concluding that the NC Commission's Order was inconsistent with the Telecommunications Act, the regulations promulgated under it, and the FCC's Local Competition Order.

### III

■ Actions of state commissions taken under 47 U.S.C. §§ 251 and 252 are reviewed in federal court *de novo* to determine whether they conform with the requirements of those sections. *See GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999); *MCI Telecomm. Corp. v. Bell Atlantic–Pennsylvania,* 271 F.3d 491, 515–17 (3d Cir.2001).

■ But even with our *de novo* standard of review, an order of a state commission may deserve a measure of respect in view of the commission's experience, expertise, and the role that Congress has given it in the Telecommunications Act. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944). To be sure, state commissions' orders construing the Telecommunications Act fall outside *Chevron's* domain and its mandate of deference to reasonable interpretations of ambiguous statutes, because the Telecommunications Act, 47 U.S.C. § 251(d)(1), delegated interpretive authority to the FCC, not to the state commissions.[6] *See United States v. Mead,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001);

---

**6.** Of course, the Telecommunications Act did delegate other responsibilities to the state commissions, such as, for example, certain rate-setting authority. *See* 47 U.S.C. § 252(d).

*MCI Telecomm.*, 271 F.3d at 516. Yet the views of state commissions may nevertheless deserve respect under *Skidmore*—the respect that flows from the long-standing principle that "the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Mead,* 533 U.S. at 227, 121 S.Ct. 2164 (*quoting Skidmore,* 323 U.S. at 139–40, 65 S.Ct. 161). In any given case, the amount of respect afforded to a state commission will vary in accordance with "the degree of the agency's care, its consistency, formality, and relative expertness," as well as "the persuasiveness of the agency's position." *Mead,* 533 U.S. at 228, 121 S.Ct. 2164.

The NC Commission's expertise and experience in applying communications law are considerable and even predate the enactment of the Telecommunications Act of 1996, as the Commission functioned under the Communications Act of 1934, and the Telecommunications Act of 1996 called upon this expertise and experience. *See* Local Competition Order ¶ 2 ("The 1996 Act forges a new partnership between state and federal regulators.... As this Order demonstrates, we have benefited enormously from the expertise and experience that the state commissioners and their staffs have contributed to these discussions"). Given the NC Commission's accumulation of knowledge and experience in telecommunications law and policy, its orders should not be taken lightly. *See* Philip J. Weiser, *Chevron, Cooperative Federalism, and Telecommunications Re-*

*form,* 52 Vand. L.Rev. 1, 24–30 (1999) (arguing for considerable deference to state commission decisions under the Telecommunications Act).

■ Additionally, respect is due the orders of the NC Commission because the NC Commission has applied its expertise and experience in formulating them. The NC Commission's orders resulted from a deliberative notice and comment process; they demonstrate valid and thorough reasoning, including careful reading and harmonizing of relevant authorities and policies; and they align with the decisions of other state commissions.[7] *See Skidmore,* 323 U.S. at 139–40, 65 S.Ct. 161; *Mead,* 533 U.S. at 227–28, 121 S.Ct. 2164.

■ Additionally, in a scheme involving cooperative federalism, federal courts should recognize the considered role of state agencies that have accepted Congress' invitation to become crucial partners in administering federal regulatory schemes. State commissions are granted authority under the Telecommunications Act, and, to the extent they voluntarily accept that authority, they become an important part of the entire regulatory scheme. *See Verizon Md., Inc. v. Global Naps, Inc.,* 377 F.3d 355, 371 (4th Cir. 2004) (Niemeyer, J., concurring in part and dissenting in part) ("even while pursuing these federal purposes, Congress left in place many of the traditional functions of State public utility commissions"); *see, e.g.,* 47 U.S.C. § 252(d) (giving state commissions rate-setting authority); *id.* § 252(e)(3) (leaving States authority to establish and enforce state law relating to

---

7. In addition to the North Carolina Utilities Commission, other state commissions have read the Telecommunications Act and regulations in this fashion. *See, e.g., In re Tariff Filing of U.S. West Communications, Inc. to "Winback" Residential Customers Who Have Changed Their Telephone Service to Another*

*Provider,* Wyo. Pub. Serv. Comm'n, No. 70,-000–TT–98–379, Rcd. No. 3992, at 29–30 (Jan. 8, 1999); *In re Petitions by AT & T Communications of the Southern States, Inc.,* Fla. Pub. Serv. Comm'n, No. PSC–96–1579–FOF–TP, at 69–71 (Dec. 31, 1996).

agreements between carriers, so long as consistent with the Act); *id.* § 252(f)(2) (permitting States to apply state law to incumbent LEC agreements); *id.* § 253(b) (preserving state authority to protect and advance universal service); *id.* § 254(f) (similar); *id.* § 261(b) (preserving state regulations not inconsistent with the Act); *id.* § 261(c) (residual authority for States to pass regulations not inconsistent with the Act).

Thus, States' continuing exercise of authority over telecommunications issues forms part of a deliberately constructed model of cooperative federalism, under which the States, subject to the boundaries set by Congress and federal regulators, are called upon to apply their expertise and judgment and have the freedom to do so. *See generally* Philip J. Weiser, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act,* 76 N.Y.U. L.Rev. 1692, 1732 (2001) ("where the FCC does not mandate a national approach to interpreting and applying the Telecom Act, state agencies are left with considerable flexibility to do so, albeit subject to federal court review").

Thus, even though we review the NC Commission's orders for compliance with 47 U.S.C. §§ 251 and 252 *de novo,* we nonetheless approach the task with a respect for the Commission's special role in the regulatory scheme, its freedom to maneuver in that role, its expertise and experience, and the care it has taken in the particular task of forming its orders.

## IV

■ Addressing the district court's first reason for reversing the NC Commission, we note that the district court assumed that the NC Commission concluded that gift cards, checks, coupons for checks, and similar types of incentives are *themselves* "telecommunications services" that incumbent LECs were required to offer competitive LECs for resale. It relied on that assumption to conclude that "there can be no argument that [such incentives] are 'telecommunication services,'" and accordingly found the NC Commission in error.

■ We agree with the district court's observations that promotions and incentives in the form of gift cards, coupons, and even gifts are not themselves "telecommunications" as addressed in 47 U.S.C. § 251(c)(4). The term "telecommunications" means "the transmission, between or among points specified by the user, of information of the user's choosing, without change in form or content of the information as sent and received." *Id.* § 153(43). But this observation fails to address accurately the scope of the resale duty imposed by § 251(c)(4). That section requires an incumbent LEC to resell its "telecommunications service" at wholesale to competing LECs, and "telecommunications service" is defined to be "the offering of telecommunications for a fee directly to the public." 47 U.S.C. § 153(46). "Telecommunications service" thus describes *both* sides of the service contract between an incumbent LEC and a consumer: (1) the "telecommunications" offered by the provider; *and* (2) the "fee" paid by the consumer. While an incentive, such as a rebate or a gift card, is obviously not "telecommunications," it does reduce the retail price or "fee" for telecommunications. As such, an incentive is part of "the offering of telecommunications" which incumbent LECs must make to would-be competitors.

■ The district court pursued a red herring in focusing on the fact that a gift card, check, coupon for a check, or other similar type of incentive is not a telecommunication. The salient question is whether the incentive affects the "fee" for tele-

communications. The NC Commission never held that the marketing incentives under discussion were "telecommunications." It noted, to the contrary, that "gift cards, checks, check coupons and similar benefits offered as an inducement to purchase telecommunication services [were] not themselves services (regulated or nonregulated) offered by a public utility." Its order "does not require that non-telecommunications services, such as gift cards, check coupons, or merchandise, be resold." Rather, the NC Commission held that the incentives had "economic value" which effectively reduced the relevant *"fee," see* 47 U.S.C. § 153(46)—the retail rate charged for telecommunications. Accordingly, the NC Commission concluded that telecommunications (the underlying telephony) must be resold to competing LECs *"at rates* that give resellers the benefit of the *change in rate* brought about by offering one-time incentives for more than 90 days." (Emphasis added).

Even though we agree with the district court's conclusion that such incentives are not themselves "telecommunications" that must be resold under § 251(c)(4), we agree with the NC Commission that incentives may nonetheless implicate the *fee* for telecommunications—the retail rate or consideration given by the consumer in exchange for telecommunications—and thereby affect the incumbent LECs' resale duty.

V

This brings us to the core issue—whether the NC Commission correctly determined that the value of incentives such as gift cards, checks, coupons for checks, or similar types of marketing incentives extending for more than 90 days must be reflected in the retail rate used for computing the wholesale rate that is to be charged to competitive LECs under 47 U.S.C. § 252(d)(3).

The NC Commission concluded that when such incentives are offered, the nominal tariff (the charge that appears on the subscriber's bill) is not the "retail rate charged to subscribers" under § 252(d)(3) because the nominal tariff does not reflect the value of the incentives. Retail subscribers are, in fact, charged *less* than the tariff rate because they receive the added value of the incentives. BellSouth insists, however, that "a give-away such as a gift card is not a price reduction, promotional or otherwise," but rather a marketing expense incurred by it to compete in the marketplace for subscribers.

The parties agree, as we also observe, that because the term "retail rate" is not defined in the Telecommunications Act, nor in the regulations promulgated under it, the question of whether incentives implicate the retail rate must be resolved in light of the pro-competition policies of the Act. *See* Local Competition Order ¶ 949. The following hypothetical demonstrates how the NC Commission viewed the question in light of these policies.

Suppose BellSouth offers its subscribers residential telephone service for $20 per month. Assuming a 20% discount for avoided costs, *see* Local Competition Order ¶¶ 931–33, BellSouth must resell this service to competitive LECs for $16 per month, enabling the competitive LEC to compete with BellSouth's $20 retail fee. Now suppose that BellSouth offers its subscribers telephone service for $120 per month, but sends the customer a coupon for a monthly rebate check for $100. According to the NC Commission's orders, the appropriate wholesale rate is still $16, because that is the *net* price paid by the retail customer ($20), less the wholesale discount (20%). According to BellSouth's position, however, the appropriate wholesale rate would be $96 (the nominal retail rate of $120, less the 20% discount for

avoided costs). Because its position would not account for the promotional rebate check, BellSouth's position would obviously impede competition. The competitive LEC would have to pay BellSouth a wholesale rate of $96 for the telephone service for which BellSouth's retail customers would pay only $20. Thus, as the NC Commission observed, by structuring its offerings with incentives, BellSouth would be able to price its competitors out of the market. Indeed, competitive LECs have alleged just such a price squeeze in proceedings currently before the FCC. *See In re Petition of Image Access, Inc. d/b/a NewPhone for Declaratory Ruling Regarding Incumbent Local Exchange Carrier Promotions Available for Resale,* Joint Comments of ABC Telecom, et al., FCC Docket No. 06–129 (filed July 31, 2006), at 5–10.

While the anticompetitive effect of a smaller incentive would not be as severe as in the hypothetical—indeed at some point an incentive undoubtedly promotes competition—the line between an incentive that is anticompetitive and one that serves as a pro-competitive marketing tool is just the type of line that the FCC is authorized and qualified to draw. Incumbent LECs have strong, indeed natural, incentives to win in the marketplace, and the FCC recognized in its Local Competition Order the real possibility that promotional offerings could be used to circumvent the pro-competitive resale requirements of the Telecommunications Act. Local Competition Order ¶ 948 ("no basis exists for creating a general exemption from the wholesale requirement for all promotional or discount service offerings made by incumbent LECs"). As the FCC ruled in its Local Competition Order, "We, as well as state commissions, are unable to predict every potential restriction or limitation an incumbent LEC may seek to impose on a reseller. Given the probability that restrictions and conditions may have anticompetitive results, we ... *presume* resale restrictions and conditions to be ... in violation of section 251(c)(4)." Local Competition Order ¶ 939 (emphasis added).

That the FCC may have drawn the line—between an anticompetitive incentive and a pro-competitive promotion—at the right place is, to some degree, indicated by the fact that both incumbent and competitive LECs have complained about its location. As one commentator has observed, "The [incumbent LECs] regard the pricing scheme as confiscatory and the arguments made on the scheme's behalf as an elaborate procedural smokescreen. The [competitive LECs] regard the question of price as settled, and treat noncooperation as a deviation from the required legislative standard." Richard A. Epstein, *Takings, Commons, and Associations: Why the Telecommunications Act of 1996 Misfired,* 22 Yale J. on Reg. 315, 339–40 (2005) (discussing unbundling requirements).

BellSouth contends that the "core issue before this Court" is the "meaning of the term 'promotion' in the context of the Act and the FCC's First Report and Order." It argues at some length that when the FCC stated that it was "only referring to ... temporary price discounts," the FCC was referring to tariff rate discounts (discounts appearing on the subscriber's bill for services). BellSouth asserts that the Local Competition Order does not address promotional offerings that do not result in a change in the tariff rate.

The NC Commission, however, exercising its statutory authority under 47 U.S.C. § 252(d)(3), determined what comprised a "retail rate" within the general parameters given by the FCC in its Local Competition Order. The NC Commission concluded in its December 22, 2004 order that while gift card type promotions were

not discount service offerings *per se* because they do not result in a reduction of the tariffed retail price charged for the regulated service at the heart of the offerings, they do result in a savings to the customers who subscribe to the regulated service. The longer such promotion is offered, the more likely the savings will undercut the tariffed retail rate and the promotional rate becomes the 'real' retail rate available in the marketplace.

The question is not, as BellSouth seems to suggest, whether the NC Commission's determination was compelled by the Local Competition Order, but rather whether it was authorized by it. Given the latitude afforded state commissions on this issue, we conclude that the NC Commission properly read the FCC's Local Competition Order to require incumbent LECs to do more than pass on to resellers only monetary discounts from the tariff rate. This is based on the Local Competition Order's contextual language; on the comments that the FCC had received in the course of crafting the order—comments which addressed not only discounts from the tariff rate, but also incentive-based promotions; and above all, on the Telecommunications Act's overarching pro-competition purpose.

It is true that the FCC did not state explicitly what it was referring to when it discussed "promotions and discounts" in its 1996 Local Competition Order. But it made amply clear that it was referring to any promotion or discount by which incumbent LECs could "avoid the statutory resale obligation by shifting their customers to nonstandard offerings, thereby eviscerating the resale provisions of the 1996 Act." Local Competition Order ¶ 948. Recognizing that promotions and discounts could amount to "retail rates" and noting that Congress did not define "retail rate,"

the FCC concluded that " 'retail rate' should be interpreted in light of the pro-competitive policies underlying the 1996 Act." *Id.* ¶ 949. Thus, it presumed that a promotion or discount offered a subscriber for 90 days or less was pro-competitive, whereas a promotion or discount offered for more than 90 days became part of a retail rate that had to be offered to competing LECs. *Id.* ¶ 950; *see also* 47 C.F.R. § 51.613(a)(2).

Both the FCC and the NC Commission thus understood that incentives can sometimes be more than "marketing expenses"; they can be devices used to create an uneven playing field. The NC Commission's orders addressed that concern well within the parameters set out by the FCC in its Local Competition Order.

BellSouth argues that the NC Commission's orders stack the deck against it, denying it the opportunity to compete by using marketing incentives unless it pays for those incentives twice—once in paying for the incentives and again in reducing its retail rate for its competitors. The competing LECs would respond in a like manner that, without the orders, they would have to pay for the incentives twice in order to compete—once when they pay for the service at a wholesale rate that was not adjusted for the incentives and again when they pay for similar marketing incentives to offer their own customers.

The NC Commission reached a sensible middle ground, in harmony with the FCC's judgment. The NC Commission observed, "[i]f a promotion is offered for an indefinite extended period of time, *at some point* it starts to become or look more like a standard retail offering that should be subject to the duty to resell at the wholesale rate." (Emphasis added). The NC Commission then concluded that that point would be 90 days, the same period specified by the FCC in its regulations and in

its Local Competition Order. *See* 47 C.F.R. § 51.613(a)(2); Local Competition Order ¶ 950 ("We therefore establish a presumption that promotional prices offered for a period of 90 days or less need not be offered at a discount to resellers. Promotional offerings greater than 90 days in duration must be offered for resale at wholesale rates pursuant to § 251(c)(4)(A)"). In so ruling, the NC Commission did not decide how to treat any particular incentive or promotion. Rather, it established guidelines similar to those given by the FCC in its Local Competition Order. Indeed, with respect to the only specific promotion discussed, the "1FR + 2 Cash Back" offer, the NC Commission indicated that it was inclined to allow the incentive, even though it amounted to a restriction on resale and lasted more than 90 days, because it was procompetitive. *See* 47 C.F.R. § 51.613(b) (the incumbent LEC can impose any restrictions that it can "prove[ ] to the State commission" are "reasonable and nondiscriminatory").

We therefore conclude that the district court erred in concluding that the NC Commission's orders violated the Telecommunications Act, the regulations promulgated under it, and the FCC's Local Competition Order. In reversing the district court and restoring the NC Commission's orders, we emphasize that the NC Commission has invited BellSouth to show that any particular restriction on resale is procompetitive, reasonable, and not discriminatory.[8]

BellSouth argues further that as an accounting matter, the NC Commission's orders would unreasonably double-count its costs of incentives. It claims that it accounts for incentives as "marketing ex-

penses" under the mandatory government accounting scheme. Such marketing expenses are presumptively subtracted from the retail rate as "avoided costs." *See* 47 U.S.C. § 252(d)(3) ("excluding ... costs that will be avoided by the local exchange carrier"); 47 C.F.R. § 51.609. And with the NC Commission's order, BellSouth must again account for the expense as a discount to the retail rate when selling its services to competing LECs.

BellSouth's argument, however, suggests a greater problem than actually exists. If the costs of incentives were accounted as avoided costs at the time the uniform wholesale discount was set, BellSouth could seek approval to reduce the wholesale discount by an appropriate amount. *See* 47 C.F.R. §§ 51.609–51.611. Moreover, the fact that BellSouth currently chooses to put the cost of incentives in the marketing account does not necessarily mean that it will do so in the future. Conceivably, BellSouth could account for its incentive costs as reductions in revenue in its revenue accounts, as the placement of items in accounts is more art than science. *See* 47 C.F.R. § 32.5000 *et seq.* Indeed, BellSouth demonstrates its own understanding of this flexibility by adopting a litigating position that appears to be inconsistent with its tax position on these expenses. BellSouth has stated in public filings that "marketing incentives, including cash coupons, packaging discounts and free service are recognized as *revenue reduction* and are accrued in the period the service is provided." Bell–South Corp., Annual Report (Form 10–K), at 61 (Feb. 24, 2004) (emphasis added). This flexibility that BellSouth has shown regarding these expenses will surely help it find the

---

8. The tenor of the NC Commission's orders suggests, for instance, that the benefit of de minimis incentives such as merchandise or low-value gift cards need not be passed on to resellers.

optimal accounting treatment in light of the NC Commission's orders.

BellSouth also argues that it would not be able to establish a value for some of the incentives for purposes of determining an effective retail rate. It points out that the value to a customer of a rebate check is less than the face value of the check because of the effort required to redeem it. Similarly, a $100 gift card is also worth less than $100 cash, because a customer can only use the gift card for certain purposes and must exert time and effort in spending it. Moreover, when a promotion is given on a one-time basis in connection with an initial offering of service, its value must be distributed over the customer's expected future tenure with the carrier and discounted to present value. The degree of difficulty in valuing incentives might, in some circumstances, support a claim that resale restrictions are reasonable and nondiscriminatory. But such issues can be negotiated between BellSouth and competitive LECs or, failing success in negotiations, resolved by the NC Commission.

BellSouth's arguments are essentially arguments of impracticality or difficulty, not arguments about what the law commands. Such impracticalities and difficulties cannot, at least at the level identified by BellSouth, determine its obligations under the Telecommunications Act, which often requires Herculean efforts on the part of incumbent LECs to accommodate their competitors. We conclude that the NC Commission's ruling on BellSouth's obligations under the Telecommunications Act is supported by applicable law.

Accordingly, we reverse the judgment of the district court and remand this case to that court with instructions to enter summary judgment in favor of the Commissioners of the NC Commission.

*REVERSED AND REMANDED*

WILLIAMS, Chief Judge, concurring in part and in the judgment:

The majority interprets the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996) (the "Telecommunications Act")'s definition of "telecommunications service" to mean that special offers featuring gift incentives form part of the "offering of telecommunications" that incumbent local exchange carriers (LECs) must make available for resale to would-be competitors. I agree. For the reasons that follow, however, I respectfully disagree with the portion of the majority opinion suggesting that the NCUC did not resolve whether the special offers at issue in this case are "promotions" within the meaning of 47 C.F.R. § 51.613(a)(2) (2006) but rather independently "established guidelines similar to those given by the FCC in its Local Competition Order," *ante* at 453.

I.

A.

Like the majority, I believe that although we review de novo the NCUC's interpretations of the Telecommunications Act and the regulations and rulings of the FCC, the orders of the state commissions nevertheless reflect "a body of experience and informed judgment to which courts ... may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). It is important to note, however, that this is an area in which the FCC has previously disagreed with the state commissions, including the NCUC. *See In the Matter of Am. Commc'ns Servs., Inc.*, 14 F.C.C.R. 21579, 21605 n. 124 (1999) (citing favorably to *MCI Telecomm. Corp. v. BellSouth Telecomm., Inc.*, 7 F.Supp.2d 674 (E.D.N.C. 1998), which invalidated a section of an

NCUC order setting out the terms of an interconnection agreement providing that "[s]hort-term promotions shall not be available for resale"); *MCI Telecomm. Corp. v. BellSouth Telecomm., Inc.,* 40 F.Supp.2d 416, 426 n. 9 (E.D.Ky.1999) (noting that BellSouth had withdrawn its argument that it was not required to resell contract service arrangements (CSAs) at the wholesale rate after "the FCC made clear that it disagreed with the PSC and other state commissions on th[e] issue" and "informed BellSouth that it would not grant Bell–South the authority to provide long distance service originating in any state in which it provides local service if such CSA restrictions exist in that state"); *In the Matter of Application of BellSouth Corp.,* 13 F.C.C.R. 539 (1997) (FCC order requiring BellSouth to offer CSAs for resale at the wholesale rate).

## B.

FCC regulations require incumbent LECs to offer their telecommunications services for resale to competing local providers (CLPs) "subject to the same conditions" on which retail subscribers receive them. 47 C.F.R. § 51.603 (2006). An incumbent LEC seeking to impose a restriction on resale ordinarily must prove to the state commission that the restriction is reasonable and nondiscriminatory. 47 C.F.R. § 51.613(b) (2003). There exist two exceptions, however, to this requirement. Pursuant to 47 C.F.R. § 51.613(a), incumbent LECs may prohibit resellers from engaging in "cross-class selling" and may offer "short-term promotions" without applying the wholesale discount to the promotional rate. 47 C.F.R. § 51.613(a)(1), (2). This case requires us to resolve whether the NCUC correctly concluded that special offers featuring gift benefits are "promotions" within the meaning of 47 C.F.R. § 51.613(a)(2).[1]

I agree with the district court that the FCC's Local Competition Order[2] limits

---

1. I agree with the majority that the NCUC's orders did not conclusively determine how to treat BellSouth's "1FR + 2Cashback" offer or any other specific offer. Rather, the NCUC sought to provide guidance on how these types of special offers should be treated under the Telecommunications Act and its implementing regulations. I do not believe, however, that the NCUC sought to independently establish guidelines similar to the FCC's. The NCUC's orders sought to provide guidance on whether gift offers are subject to the resale requirements set forth in the Telecommunications Act and the FCC regulations by determining whether such offers (1) form part of an offering of telecommunications, and (2) constitute "promotions" within the meaning of 47 C.F.R. § 51.613(a)(2). In its initial order, the NCUC agreed with commenters and the Public Staff that "gift cards, checks, check coupons and similar benefits offered as an inducement to purchase telecommunication services ... are promotional discounts." (J.A. at 25.) The NCUC's Clarifying Order emphasizes that the initial order "should not be read as a change of law or policy," and that "[i]f the Commission is

called upon to determine whether a promotion offered for more than 90 days must be offered to resellers at the promotional rate minus the wholesale discount, the Commission will follow the law as stated in 47 U.S.C. 251(c)(4) and 47 C.F.R. 51.613(a)(2) and (b)." (J.A. at 43.) Thus, this case requires us to resolve whether the NCUC's interpretation of "the law as stated in ... 47 C.F.R. 51.613(a)(2)," (J.A. at 43),—that special offers featuring gift benefits are "promotions" within the meaning of 47 C.F.R. § 51.613(a)(2)— was correct. I therefore disagree with the majority opinion to the extent that it suggests that the NCUC's orders sought to independently "establish[ ] guidelines similar to those given by the FCC in its Local Competition Order." *Ante* at 453.

2. *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, Report and Order,* 11 F.C.C.R. 15499 (1996), *aff'd in relevant part and remanded on other grounds, Iowa Utils. Bd. v. FCC,* 120 F.3d 753, 819 (8th Cir.1997), *aff'd in part and remanded on other grounds, AT & T Corp. v. Iowa Utils.*

the scope of the term "promotions" and therefore forecloses the interpretation adopted by NCUC. In its Local Competition Order, the FCC stated that, in discussing promotions, it was "only referring to price discounts from standard offerings that will remain available for resale at wholesale rates, *i.e.,* temporary price discounts." Local Competition Order, para. 948. This statement makes clear that the FCC intended the term "promotion" to refer only to temporary price discounts. This interpretation is bolstered by the language of the regulation itself, which provides that,

> An incumbent LEC shall apply the wholesale discount to the ordinary rate for a retail service rather than a *special promotional rate* only if:
>
> (I) Such promotions involve rates that will be in effect for no more than 90 days; and
>
> (ii) The incumbent LEC does not use such promotional offerings to evade the wholesale rate obligation, for example by making available a sequential series of 90–day promotional rates.

47 C.F.R. § 51.613(a)(2) (emphasis added). Thus, the regulation specifically contemplates a "special promotional rate" brought about by the "temporary price discount" referenced in the Local Competition Order.

The NCUC conceded that special offers featuring gift benefits are not "discount service offerings *per se* because they do not result in a reduction of the tariffed retail price charged for the regulated service at the heart of the offerings," but reasoned that they "do provide a savings and therefore a type of discount to sub-

scribers for the regulated services provided." (J.A. at 33, 34.)[3] The NCUC thus reasoned that because anything of economic value given to a customer represents a benefit to the customer that may offset the cost of service, "anything of economic value paid, given, or offered to a customer to promote or induce purchase of a ... service offering ... is a promotional discount." (J.A. at 25.) Section 51.613(a)(2) and the Local Competition Order, however, do not broadly encompass "anything of economic value," (J.A. at 25), but instead contemplate only "temporary price discounts" giving rise to "special promotional rates," 47 C.F.R. § 51.613(a)(2); Local Competition Order, para. 948. Both legal and non-legal dictionaries define a "discount" as "[a] reduction from the full amount or value of something, esp[ecially] a price." *Black's Law Dictionary* 498 (8th ed.2004); *see also Merriam–Webster's Collegiate Dictionary* 357 (11th ed.2004) (defining "discount" as "a reduction made from the gross amount or value of something: as a(1): a reduction made from a regular or list price....").

In addition to recognizing that gift offers are not discount service offerings *per se,* the NCUC recognized that gift offers have different anti-competitive effects than do direct price discounts. It determined that gift offers "do not have the same degree of anti-competitive effect that a direct discounting of the retail price would have on a reseller market." (J.A. at 34.) The conclusion that gift offers do not have the same degree of anti-competitive effect as price discounts undermines the NCUC's finding that gift offers are "promotional discounts."

---

*Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

**3.** Citations to the "J.A." refer to the contents of the joint appendix filed by the parties to this appeal.

The FCC's determination that promotional rates "cease to be 'short-term' and must therefore be treated as a retail rate for an underlying service" if they are greater than 90 days in duration was the result of a careful balancing of the pro- and anti-competitive effects promotional prices. Local Competition Order, paras. 946–50; *see also* 47 C.F.R. § 51.613(a)(2). Accordingly, I believe we should not expand 47 C.F.R. § 51.613(a)(2)'s exemption for short-term promotions to one-time gift offers, which have a lesser anti-competitive effect than do direct price discounts and to which the FCC did not anticipate that the exemption would apply.[4]

### C.

The majority opinion does not address the NCUC's belief that gift offers have lesser anti-competitive effects than price discounts. Instead, it emphasizes that incentives to subscription may be "used to create an uneven playing field," *ante* at 452, and seeks to demonstrate potential anti-competitive effects by way of a hypothetical. The hypothetical involves an incumbent LEC that sends its customers a *monthly* rebate check. *See Ante* at 450–51. The NCUC's orders, however, focused on *one-time* gifts offered as an inducement to subscription. The NCUC issued its first order in response to the Public Staff's request for guidance on the applicability of the Telecommunications Act's resale obligations to such offers. The Public Staff argued that "bill credits, gift cards, checks or coupons offered to customers by a company's regulated business . . . to encourage subscription to a regulated service are promotions featuring price discounts." (J.A. at 24.) In its first order, the NCUC agreed with the Public Staff that "gift

cards, checks, check coupons and similar benefits offered as an inducement to purchase telecommunications services . . . are promotional discounts." (J.A. at 25.) In its Clarifying Order, the NCUC described its initial order as an "Order regarding resale obligations applicable to *one-time* gift promotions." (J.A. at 47 (emphasis added).) The Clarifying Order explains that the NCUC's Order of December 22, 2004 "requires that telecommunications services subject to the resale obligation of Section 251(c)(4) be resold at rates that give resellers the benefit of the change in rate brought about by offering *one-time* incentives for more than 90 days." (J.A. at 46 (emphasis added).)

Consideration of the one-time gift offers addressed by the NCUC's orders reveals an important distinction between such offers and price discounts. A customer must continue to subscribe to an incumbent LEC's services to receive a discounted rate for those services. Customers receiving one-time gifts with no corresponding obligation to commit to a particular term of service, in contrast, may attempt to take advantage of the special offer by signing up for the gift benefit and cancelling their service soon or shortly thereafter. Moreover, the time period during which the incumbent LEC makes a one-time gift offer available does not affect the value of the gift. With a direct price discount (or a recurring gift benefit), the longer the discount is offered, the more savings a customer receives. With a one-time gift offer, in contrast, the customer receives the same gift regardless of the duration of the offer. Thus, whether the offer extends for more than 90 days would have a minimal im-

---

**4.** Notably, in arguing for a broad construction of the term "promotions," the NCUC commissioners stress that "[t]he statement in ¶ 948 was written in 1996, long before the type of promotional offering at issue in this case began to appear." (J.A. at 30.)

pact on the anti-competitive effects of the special offer.

Concluding that the gift offers at issue are not "promotions" within the meaning of 47 C.F.R. § 51.613(a)(2) would not prevent the NCUC from exercising oversight over gift offers or allow incumbent LECs to use this type of special offer to create an uneven playing field. To the contrary, it would impose a greater burden on incumbent LECs. Section 51.613(a)(2) allows restrictions on the resale of short-term promotions as a narrow exemption to the general rule that incumbent LECs "may impose a restriction [on resale] only if it proves to the state commission that the restriction is reasonable and non-discriminatory." 47 C.F.R. § 51.613(b). Accordingly, concluding that gift-offers are not "promotions" would require incumbent LECs to prove to the state commission that restrictions on the resale of *all* offers including gift incentives (and not merely those lasting for more than 90 days) were reasonable and nondiscriminatory. Such a case-by-case analysis would allow the NCUC to apply its expertise in assessing the pro- and anti-competitive effects of this particular type of special offer. This assessment by the NCUC would better serve the goals of the statute and the FCC regulations than applying an ill-fitting exemption designed to address a different type of special offer with admittedly different anti-competitive effects.

## II.

In sum, I concur in the majority's interpretation of the Telecommunications Act and ultimate conclusion that special offers featuring gift benefits offered for more than 90 days must be made available to resellers in the form of a reduced wholesale price. I believe, however, that one-time gift offers are not price discounts within the meaning of the FCC's Local Competition Order and therefore do not constitute "promotions" within the meaning of 47 C.F.R. § 51.613(a)(2).