**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

In Re: MUTUAL FUNDS INVESTMENT
LITIGATION

---

CRAIG WANGBERGER, on behalf of
himself and all others similarly
situated,

*Plaintiff-Appellant,*

v.

JANUS CAPITAL GROUP,
INCORPORATED; PLAN ADVISORY
COMMITTEE,

*Defendants-Appellees,*

and

CHARLES SCHWAB TRUST COMPANY;
ADVISORY COMMITTEE; STEVEN L.
SCHEID; G. ANDREW COX; PAUL F.
BALSER,

*Defendants.*

No. 06-2003

---

SECRETARY OF LABOR,
     *Amicus Supporting Appellant,*

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,
     *Amicus Supporting Appellees.*

In Re: MUTUAL FUNDS INVESTMENT LITIGATION

---

MIRIAM CALDERON, individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

v.

AMVESCAP NATIONAL TRUST COMPANY; AVZ INCORPORATED,

*Defendants-Appellees,*

and

AMVESCAP PLC; AMVESCAP RETIREMENT, INCORPORATED; ROBERT F. MCCULLOUGH; GORDON NEBEKER; JEFFREY G. CALLAHAN; INVESCO FUNDS GROUP, INCORPORATED; RAYMOND R. CUNNINGHAM; DOES 1-100,

*Defendants.*

---

SECRETARY OF LABOR,
        *Amicus Supporting Appellant,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
        *Amicus Supporting Appellees.*

No. 06-2176

In Re: Mutual Funds Investment Litigation

---

Jessica Corbett, on behalf of herself and all others similarly situated,

*Plaintiff-Appellant,*

and

Aurora Henao; Barbara Walsh,

*Plaintiffs,*

v.

Marsh & McLennan Companies, Incorporated; Putnam Investments, LLC; J. W. Greenberg; Francis N. Bonsignore; William L. Rosoff; Sandra S. Wijnberg,

*Defendants-Appellees,*

and

Putnam Investments Trust; Norman Berham; Lewis W. Bernard; Richard H. Blum; Frank J. Borelli; Robert F. Erburu; Ray J. Groves; George Putnam; John D. Ong; The Right Honorable Lord Lang of Monkton; Adele Smith Simmons; A.J.C. Smith; Peter Coster; Lawrence J. Lasser; David A. Olsen; John T. Sinnott; Frank J. Tasco; Stephen R. Hardis; Saxon Riley; Gwendolyn S. King; W.R.P. White-Cooper; Mathis Cabiallavetta; Charles A. Davis;

No. 06-2177

MORTON O. SCHAPIRO; IRENE M.
ESTEVES; PATRICIA A. AGNELLO;
DONALD E. MULLEN; PUTNAM
RETIREMENT SAVINGS PLAN
COMMITTEE; MARSH & MCLENNAN
COMPANIES, INCORPORATED, Stock
Investment Plan Committee; MARSH
& MCLENNAN, INCORPORATED,
Benefits Administration Committee;
SANDRA WRIGHT,

                              *Defendants.*

SECRETARY OF LABOR,
          *Amicus Supporting Appellant,*

CHAMBER OF COMMERCE,
          *Amicus Supporting Appellees.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:05-cv-02711-JFM; 1:04-cv-00824-JFM; 1:04-cv-00883-JFM)

Argued: December 5, 2007

Decided: June 16, 2008

Before NIEMEYER and SHEDD, Circuit Judges, and
Leonie M. BRINKEMA, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Shedd and Judge Brinkema joined.

## COUNSEL

**ARGUED:** Samuel K. Rosen, HARWOOD & FEFFER, L.L.P., New York, New York, for Appellants. Kristen Lindberg, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Supporting Appellants. Mark Andrew Perry, GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Paul Blankenstein, Dustin K. Palmer, GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for Appellees Janus Capital Group, Incorporated, and Janus Plan Advisory Committee; Robert N. Eccles, Gary S. Tell, Shannon M. Barrett, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellees Marsh & McLennan Companies, Incorporated, Putnam Investments, L.L.C., J. W. Greenberg, Francis N. Bonsignore, William L. Rosoff, and Sandra S. Wijnberg; Maeve L. O'Connor, Maura K. Monaghan, DEBEVOISE & PLIMPTON, L.L.P., New York, New York, for Appellees Amvescap National Trust Company and AVZ Incorporated. Howard M. Radzely, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor for Plan Benefits Security, Karen L. Handorf, Counsel for Appellate and Special Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Supporting Appellants. Robin S. Conrad, Shane Brennan, NATIONAL CHAMBER LITIGATION CENTER, Washington, D.C.; Carol Connor Flowe, Nancy S. Heermans, Caroline Turner English, ARENT FOX, L.L.P., Washington, D.C., for Amicus Supporting Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

The plaintiffs, each of whom purports to represent a class of others similarly situated, are former employees who maintained accounts in § 401(k) defined contribution retirement plans sponsored by their employers and who, upon leaving employment, voluntarily sought and obtained full distribution of the vested benefits in their respective accounts. They commenced these actions under the Employee Retirement Income Security Act of 1974 ("ERISA") against the fiduciaries of their respective retirement plans, for breach of their fiduciary

duties to the plans based on the fiduciaries' knowing investment in mutual funds that allowed investors to practice market timing, an abusive form of arbitrage activity that favored the market timers and harmed long-term investors in the funds, such as the plaintiffs. The plaintiffs sued the fiduciaries under §§ 502(a)(2) and 409(a) of ERISA, which allow for a derivative action to be brought by a retirement plan "participant" on behalf of the plan to obtain recovery for losses sustained by the plan because of breaches of fiduciary duties.

The defendants filed motions to dismiss the plaintiffs' claims, challenging their standing to assert the claims under both ERISA and Article III of the Constitution. The district court granted their motions, finding that the plaintiffs did not fall within the class of individuals authorized to sue under ERISA § 502(a)(2) because, having cashed-out of the plans, they were no longer seeking "benefits," as required to have statutory authority to sue, but rather money damages.

Because we conclude that cashed-out former employees remain "participants" in *defined contribution* retirement plans for purposes of § 502(a)(2) of ERISA when they seek to recover amounts that they claim should have been in their accounts had it not been for alleged fiduciary impropriety, we find that they have "statutory standing." And because the plans at issue are *defined contribution* plans, rather than *defined benefit* plans, we reject the defendants' argument that the plaintiffs' injuries are not redressable and therefore that they lack Article III standing. Accordingly, we reverse the judgments of the district court and remand these cases for further proceedings.

I

When Craig Wangberg,[1] Miriam Calderon, Jessica Corbett, and Anita Walker retired from their respective employments, they voluntarily "cashed out" their vested interests in defined contribution retirement plans that their employers had sponsored. "Defined contribution" plans are plans that provide for individual accounts and that define the participants' benefits as the contents of their accounts, including contributions (from both participants and employers), as

---

[1]Craig Wangberg's case has, from the beginning, incorrectly carried his name into the caption as "Wangberger."

well as the investment gains minus investment losses and any allocable plan expenses. *See* 29 U.S.C. § 1002(34). Before these employees had been paid the value of their accounts in the defined contribution plans, the plans had invested in various mutual funds that allowed investors to practice a form of arbitrage known as market timing, in which investors move in and out of the funds to take advantage of the temporary differentials between the mutual funds' daily-calculated "net asset value" ("NAV") and the market price of the component stocks during the course of a day. Not only does market timing favor the market timers at the expense of long-term investors in mutual funds, it also increases the funds' costs and impairs investment performance. *See generally SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 458 (S.D.N.Y. 2004); *Prusky v. Reliastar Life Ins. Co.*, 445 F.3d 695, 697-98 & n.4 (3d Cir. 2006); *see also* Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70,402, 70,402-04 (proposed Dec. 17, 2003) (describing mutual fund market timing in detail).

Market timing can harm mutual fund investors by causing mutual funds to manage their portfolios in a manner that is disadvantageous to long-term shareholders. Disclosure Regarding Market Timing, 68 Fed. Reg. at 70,404. For example, investment advisors might maintain a larger percentage of fund assets in cash or liquidate certain portfolio securities prematurely to meet higher levels of redemptions due to market timing activity occurring within the fund. *Id.* "It would make little sense for a fund manager to invest in assets with significant long-term potential but high short-term volatility if a market timer's redemptions could force the quick sale of fund assets." *Pimco*, 341 F. Supp. 2d at 458. Moreover, market timing can "increas[e] trading and brokerage costs, as well as tax liabilities, incurred by a fund and spread across all fund investors." *Id.*

Market timing can be especially problematic when it occurs in mutual funds that invest in overseas securities because the time zone differences allow market timers to purchase shares of such funds "based on events occurring after foreign market closing prices are established, but before the fund's NAV calculation." Disclosure Regarding Market Timing, 68 Fed. Reg. at 70,403. Prior to the daily NAV calculation, which in the United States generally occurs at or near the closing time of the major U.S. securities markets, the fund

price would not take into account any changes that have affected the value of the foreign security. Therefore, if the foreign security had increased in value, the NAV for the mutual fund would be artificially low. *Id.* After purchasing the shares at the low price, "the market timer would redeem the fund's shares the next day when the fund's share price would reflect the increased prices in foreign markets, for a quick profit at the expense of long-term fund shareholders." *Id.* Market timing opportunities also exist in mutual funds that do not invest in foreign markets, such as small-cap stocks and high-yield bonds, which are relatively illiquid assets and are not frequently traded. *Id.*; *see also* Richard L. Levine, Yvonne Cristovici & Richard A. Jacobsen, *Mutual Fund Market Timing*, Fed. Lawyer, Jan. 2005, at 28, 30.

The harm that market timing can cause to the interests of investors, especially long-term investors, has led many mutual funds to adopt policies and to impose fees intended to limit market timing within their funds. It has also led to increased regulatory action by the Securities and Exchange Commission. *See, e.g.*, Disclosure Regarding Market Timing, 68 Fed. Reg. at 70,402. In addition, in 2003, both state and federal regulators began investigating mutual funds that allowed the practice. These investigations led to SEC-sponsored settlements totaling more than $3.5 billion paid by investment advisors to mutual funds in approximately 20 mutual fund complexes. In the wake of this regulatory activity, hundreds of civil actions alleging abusive mutual fund market timing were filed by mutual fund investors and participants in employee retirement plans.

The civil actions concerning mutual fund market timing, including the four cases appealed to us, were transferred by the Judicial Panel on Multidistrict Litigation to three judges in the District of Maryland for coordinated pretrial proceedings. *See In re Janus Mut. Funds Inv. Litig.*, 310 F. Supp. 2d 1359, 1361-62 (J.P.M.L. 2004).

The plaintiffs in the four cases initially before us filed class action claims against their employers and other fiduciaries of their defined contribution retirement plans, which had invested in mutual funds allowing market-timing activity. At the time they commenced these actions, none of the plaintiffs remained employed by the companies sponsoring their plans, nor did any continue to have open accounts

with these plans. They had all "cashed out" their vested benefits. In their complaints, brought under ERISA § 502(a)(2), the plaintiffs alleged that the defendant fiduciaries knowingly invested in mutual funds that allowed improper and abusive market timing, materially diluting the value of the funds and therefore the value of their individual retirement accounts, in violation of the fiduciary duties imposed by ERISA § 409(a). They alleged that due to the breach of fiduciary duties, their individual retirement accounts in the defined contribution plans suffered a diminution in value and that therefore they did not receive the full benefits to which they were entitled under the relevant plans when they cashed out. The defendants filed motions to dismiss, arguing that because each of the named plaintiffs had terminated his or her employment and had cashed out of his or her retirement plan, taking a full distribution of the account's contents before filing suit, the plaintiffs lacked standing to sue.

The district court initially denied the defendants' motions to dismiss in three of the cases, finding that the cashed-out former-employee plaintiffs in those cases had standing to bring their ERISA claims. *Corbett v. Marsh & McLennan Cos., Inc.*, No. MDL-15863, Civ. JFM-04-0883, 2006 WL 734560 (D. Md. Feb. 27, 2006); *Calderon v. Amvescap PLC*, No. MDL-15864, Civ. JFM-04-0824, 2006 WL 735006 (D. Md. Feb. 27, 2006); *Walker v. Mass. Financial Servs. Co.*, No. MDL-15863, Civ. JFM-04-1758, 2006 WL 734796 (D. Md. Feb. 27, 2006). When it came time to decide the motion to dismiss in Wangberg's case, however, the district court reached a contrary conclusion and granted the motion, concluding that cashed-out former employees are not afforded the right to sue under ERISA § 502(a)(2). *Wangberger v. Janus Capital Group In re Mut. Funds Inv. Litig.*, No. MDL-15863, Civ. JFM-05-2711, 2006 WL 2381056 (D. Md. Aug. 15, 2006). Explaining the discrepancy in outcomes, the court stated that after deciding the first three cases, it was persuaded by a number of district courts that had in the interim found a lack of standing in similar cases.[2] After reversing its position in deciding *Wangberger*,

---

[2]*See Graden v. Conexant Sys., Inc.*, No. Civ. 05-0695, 2006 WL 1098233 (D.N.J. Mar. 31, 2006); *In re RCN Litig.*, No. 04-5068 (SRC), 2006 WL 753149 (D.N.J. Mar. 21, 2006); *Holtzscher v. Dynegy, Inc.*, No. Civ. A. H-05-3293, 2006 WL 626402 (S.D. Tex. Mar. 13, 2006);

the district court then reconsidered its earlier decisions in *Corbett*, *Calderon*, and *Walker* and granted the motions to dismiss for lack of standing in each of those cases also. In dismissing the four cases, the district court concluded that the plaintiffs' claims were "more in the nature of claims for damages than for payment of a vested benefit." *In re Mutual Funds Invest. Litig.*, 2006 WL 2381056, at *1. It explained:

> My ruling . . . should not be read as implying that former participants do not have standing to sue Plan fiduciaries or the Plan itself in the event that a Plan obtains a recovery in an investor class action . . . and then chooses not to distribute a *pro rata* portion of the recovery to former participants whose retirement accounts held shares in the relevant mutual funds during the class period. If that were to occur, the focus of litigation instituted by a former Plan participant would be upon how to allocate a sum certain among various beneficiaries with conflicting claims, not upon determining the fiduciaries' asserted liability for making imprudent investments — and, in the event of a finding of liability — reducing to a set amount alleged investment losses of inherently inchoate value. These questions are quite different from one another, and former participants may have the right to assure that the Plan or its fiduciaries distribute to them, rather than giving to others or retaining for the Plan itself, benefits that in fairness and good conscience are due to them.

*Id.* at *n.2.

The plaintiffs in each of the four cases appealed, and we consolidated their appeals to decide the single issue of whether the plaintiffs have statutory and constitutional standing. Subsequently, the parties

---

*LaLonde v. Textron Inc.*, 418 F. Supp. 2d 16 (D.R.I. 2006); *In re Admin. Comm. ERISA Litig.*, No. C03-3302 PJH, 2005 WL 3454126 (N.D. Cal. Dec. 16, 2005). The decision in *Graden* was later reversed by the Third Circuit, 496 F.3d 291, 303 (3d Cir. 2007), *cert. denied*, 128 S. Ct. 1473 (2008).

to the *Walker* case filed a stipulation of voluntary dismissal, leaving us with three cases on appeal.

## II

Arguing from the language of ERISA, the plaintiffs contend that the district court erred because "participants' benefits in a 'defined contribution' plan are vested in all contributions and earnings and any other plan assets allocated to their individual accounts." Because "the Plans' assets (including recovery from loss) are considered the benefits of the Plans' participants," when each plaintiff took the distribution of his or her account, the account "had lost value due to Defendants' actions, [and therefore] each has a colorable claim to the appropriate increase in his or her vested benefit," giving each standing to assert that claim.

The defendants contend that because the plaintiffs have already been paid their full contributions, they do not have a "colorable claim to vested benefits," citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117-18 (1989). They argue that benefits are defined in the present as "the amount contributed to the participant's account" as well as "any income, expenses, gains and losses . . . which may be allocated to such participant's account." 29 U.S.C. § 1002(34). Amplifying on this, they state:

> Here, plaintiffs have *already* received the entirety of the net contributions to their accounts, and thus have no claim (much less a "colorable" one) that they are owed some or all of those contributions. Upon termination of their employment, plaintiffs received lump sum distributions of their respective contributions net of expenses, etc. — that is, all benefits then vested. They make no claim that these amounts were miscalculated or misstated. For this reason, plaintiffs err in arguing that "[i]t is the *claim* to that amount that must be colorable[,] not the amount itself." Plaintiffs have no colorable claim to *any* amount of vested benefits.

We begin with the relevant texts, noting that ERISA § 502(a)(2) provides that "a participant" may bring a civil action against fidu-

ciaries for breaches of their duties as articulated in ERISA § 409(a). *See* 29 U.S.C. § 1132(a)(2). Section 409(a) provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter *shall be personally liable to make good to such plan any losses to the plan resulting from each such breach*, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a) (emphasis added). The "participant" who may so sue is defined to be:

> any employee or *former employee* of an employer, or any member or former member of an employee organization, *who is or may become eligible to receive a benefit of any type from an employee benefit plan* which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7) (emphasis added). As noted, the Supreme Court in *Firestone* defined a participant under these sections of ERISA to include a *former* employee with "a colorable claim to vested benefits." *Firestone*, 489 U.S. at 118.

After the district court entered its judgments in these cases, denying the plaintiffs standing, the Supreme Court decided *LaRue v. DeWolff, Boberg & Associates, Inc.*, 128 S. Ct. 1020 (2008), in which the Court took *Firestone* a step further and held that ERISA authorized a cashed-out former employee to sue his former employer and the defined contribution plan for breach of fiduciary obligation that caused a loss in his *individual* plan account, to claim "any profit which would have accrued to the [plan] if there had been no breach of trust." *Id.* at 1024 n.4 (internal quotation marks omitted). While plaintiff LaRue had argued in the district court that he only wanted "the plan to properly reflect that which would be his interest in the

plan, but for the breach of fiduciary duty," the district court rejected that argument and concluded that since the defendants "did not possess any disputed funds that rightly belonged to [him], [the plaintiff] was seeking damages rather than equitable relief." *Id.* at 1023. Reversing the district court and the court of appeals, the Supreme Court concluded that the plaintiff was authorized to bring his claim for loss of plan assets in his *individual* account under ERISA § 502(a)(2), notwithstanding its earlier decision in *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985). In *Russell*, the Court had held that § 502(a)(2) provided remedies *only for entire plans*, not for individuals. 473 U.S. at 140-41. The *LaRue* Court, however, distinguished *Russell* on the basis that the *Russell* Court addressed a *defined benefit* plan rather than a *defined contribution* plan.[3] As the *LaRue* Court explained:

> Misconduct by the administrators of a *defined benefit plan* will not affect *an individual's entitlement* to a defined benefit unless it creates or enhances the risk of default by the entire plan.

128 S. Ct. at 1025 (emphasis added). But in a *defined contribution* plan, the Court pointed out, the benefit is the participant's interest in an individual account, and the "misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive." *Id.* at 1025. The Court noted that the diminishment of plan assets payable *through individual accounts* was "the kind of harm[ ] that concerned the draftsmen of § 409." *Id.* Thus, the *LaRue* Court held:

> [A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets *in a participant's individual account*.

---

[3]Distinguishing a *defined contribution* plan from a *defined benefit* plan, the Court explained that a defined contribution plan "promises the participant the value of an individual account at retirement," whereas a defined benefit plan "promises the participant a fixed level of retirement income." *LaRue*, 128 S. Ct. at 1022 n.1.

*Id.* at 1026 (emphasis added).

We believe that the holding in *LaRue* controls the outcome here.

Thus, while *Firestone* held that former employees who maintained active retirement accounts with funds invested in them would qualify as "participants" under ERISA, *LaRue* took the short additional step to conclude that even a former employee *who cashed out* his vested benefits in a plan would remain a "participant," so long as (1) the fiduciaries are "chargeable with . . . any profit which would have accrued to the [plan] if there had been no breach of trust," *LaRue*, 128 U.S. at 1024 n.4 (omission in original) (internal quotation marks omitted), and (2) the participant has a claim that the profits would have increased the benefit to which he would have been entitled had the breach not occurred, *id.* at 1025. *See also id.* at 1026 n.6; *Harzewski v. Guidant Corp.*, 489 F.3d 799, 804-05 (7th Cir. 2007); *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 296-97 (3d Cir. 2007), *cert. denied*, 128 S. Ct. 1473 (2008); *Bridges v. Am. Elec. Power Co.*, 498 F.3d 442, 445 (6th Cir. 2007). As the court in *Graden* stated, "[i]f the plaintiff colorably claims that under the plan and ERISA he was entitled to more than he received on the day he cashed out, then he presses a claim for vested benefits and must be accorded participant standing." 496 F.3d at 300.

As in *LaRue* and the courts of appeals' opinions cited, the plaintiffs' claims here are based on allegations that breaches of fiduciary duties diminished the values of their individual accounts and that the plans entitled them to more than they received on the days they cashed out of them. Had the fiduciaries acted in accordance with their duties, the plaintiffs claim, their accounts would have held more money on the days they cashed out. Thus, because plan documents and ERISA entitled them to more money on the days they cashed out, their claims are for additional *benefits*, and not for damages as the district court held.

The defendants' argument that the plaintiffs took full distributions of the contents of their accounts at the time they cashed out is persuasively answered by the discussion in *Harzewski*:

> Suppose [the defendant] had stolen half the money in a plan participant's retirement account and a suit by the participant

resulted in a judgment for that amount; the suit would have established the retiree's eligibility for the larger benefit. There is no difference if instead of stealing the money from the account, [the defendant] by imprudent management caused the account to be half as valuable as it would have been under prudent management.

489 F.3d at 804. Taking the Seventh Circuit's analogy in *Harzewski* a step further, imagine that instead of stealing half the money in a plan participant's retirement account, a defendant fiduciary steals all of the money in the account. The retiree would not cease to be a "participant" merely because the account balance equaled zero as a result of the defendant's improper conduct. Likewise, when the account balance is reduced because of a fiduciary's mismanagement, causing the balance to reach zero before a retiree receives his full benefits due, the account holder remains a "participant." Thus, a retiree's eligibility to obtain plan benefits does not end when his account balance becomes zero, as the defendants suggest. "The benefit in a defined-contribution pension plan is, to repeat, just whatever is in the retirement account when the employee retires or *whatever would have been there had the plan honored the employee's entitlement*, which includes an entitlement to prudent management." *Id.* at 804-05.

In short, we conclude that participants in defined contribution plans controlled by ERISA have colorable claims against the fiduciaries of their plans when they allege that their individual accounts in the plans were diminished by fraud or fiduciary breaches and that the amounts by which their accounts were diminished constitute part of the participants' benefits under the plans. The plaintiffs' claims in this case are for such additional benefits, not damages, and they therefore have standing to sue under ERISA § 502(a)(2).

### III

Because we conclude that the plaintiffs have "statutory standing" to bring their claims, we must also now decide whether they have constitutional standing, as required by Article III of the U.S. Constitution, for it is conceivable that a person is a member of the class given authority by a statute to bring suit but nonetheless has not, for example, sustained injury that would be redressable by a favorable decision

of the court. *See, e.g.*, *Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005).

Article III standing is a fundamental, jurisdictional requirement that defines and limits a court's power to resolve cases or controversies. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 298 (4th Cir. 2005). And "the irreducible constitutional minimum of standing" consists of injury-in-fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005).

In this case, the first two elements are not at issue: If the plaintiffs' allegations are true, they suffered injury in that their retirement accounts were worth less than they would have been absent the breach of duty, and this injury was caused, as the plaintiffs have alleged, by the fiduciaries' misconduct. The defendants contend, however, that the plaintiffs have not satisfied the third element of constitutional standing — that their injury be redressable by a favorable decision in this litigation.

Defendants contend that even if the plaintiffs can prove the merits of their case, it is wholly speculative whether any recovery by the plan would pass through to the plaintiffs' individual accounts. Yet, for an injury to meet the redressability standard, "it must be '*likely*,' as opposed to *merely 'speculative*,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (emphasis added) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). The defendants rest their argument that redress for the plaintiffs' injury is speculative on two points.

First, they assert that whether the plaintiffs recover any money in these cases is "entirely dependent on the discretionary actions of third parties (retirement plan fiduciaries)" and that therefore Article III standing cannot be met, citing *ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989). In *ASARCO*, the plurality concluded that the redressability requirement had not been met because even if the plaintiff association prevailed, "[w]hether the association's claims of economic injury would be redressed by a favorable decision [depended] on the unfet-

tered choices made by *independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.*" *Id.* at 615 (emphasis added). Of course, the defendants point out, if the fiduciaries are not before the courts and they have discretion that cannot be controlled or predicted, then any relief for the plaintiffs would be entirely speculative. But that is not the case here.

In these cases before us, the plaintiffs have made the plan fiduciaries parties to the actions, suing all of the fiduciaries that controlled the investment decisions of the plans' funds. As applicable to their respective plans, the plaintiffs sued the plan sponsors, the plan administrators, the plan trustees, and members of advisory investment committees, and they alleged that these fiduciaries knew that the mutual funds in which they were investing allowed market timing activity and that this activity favored the market timers at the expense of long-term investors, such as the plaintiffs. They asserted that because of imprudent investment decisions by the fiduciaries, their individual accounts in the respective plans were diminished.

Unlike the circumstances in *ASARCO* and the other similar cases cited by the defendants, the fiduciaries *are* in fact before the court in these cases and can respond to court orders to redress wrongs. Section 409(a) of ERISA provides that a court may direct fiduciaries to repay the plans and that, in addition, fiduciaries "shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a).

The defendants' second point in support of their redressability argument is that "[p]laintiffs have failed to adduce *any* facts showing that the plan fiduciaries are *likely* to distribute any award in this action to former employees, nor have they demonstrated that the district court would have the authority to order the plan fiduciaries to do so in this case." They point out that recovery by the plans for fiduciary misconduct would become *plan* assets over which the fiduciaries would have full discretion, and that their discretion must be exercised "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). They conclude that the

duties of plan fiduciaries run to the *plan as a whole*, not to any individual subset of plan participants, and therefore it can only be speculation whether the plaintiffs' individual accounts would benefit from a favorable decision.

This traditional argument based on *Russell*, however, rests on ERISA jurisprudence governing *defined benefit* plans, in which the *plan* was paramount and once a participant was paid the defined benefit, only the plan or those with current plan accounts had an interest in recovering losses caused by fraud or other misconduct. As the Supreme Court pointed out in *LaRue*, the early ERISA cases, including *Russell*, were decided as they were because the plaintiffs in those cases were participants in *defined benefit* plans so that when the plan was injured, it did not *necessarily* affect a participant's defined benefit. Once the plaintiff received the defined benefit, he could receive no more. As the *LaRue* Court explained, "A 'defined benefit plan' . . . generally promises the participant a fixed level of retirement income, which is typically based on the employee's years of service and compensation," *LaRue*, 128 S. Ct. at 1022 n.1, and a plaintiff who received a defined benefit could receive no more even if the plan had been defrauded, *id.* at 1024-25. The *LaRue* Court pointed out, however, that since *Russell*, things have changed, and today "*[d]efined contribution* plans dominate the retirement plan scene." *Id.* at 1025 (emphasis added). "[A] 'defined contribution plan' or 'individual account plan' promises the participant *the value of an individual account at retirement*, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." *LaRue*, 128 S. Ct. at 1022 n.1 (emphasis added). As a consequence, any fraud that diminishes the value of a participant's individual account is a harm for which the participant may sue under §§ 502(a)(2) and 409(a) of ERISA. *Id.* at 1025. As the Supreme Court articulated its holding:

> [A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision *does authorize* recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account.

*Id.* at 1026 (emphasis added). Thus, the defendants' argument that only the entire *plan* has an interest in the recovery is defeated by the

*LaRue* Court's observation that "our references to the 'entire plan' in *Russell*, which accurately reflect the operation of § 409 *in the defined benefit context, are beside the point in the defined contribution context*." *Id.* at 1025 (emphasis added).

Of course, a participant suing to recover benefits on behalf of a defined contribution plan for breach of a fiduciary duty is still not entitled to have monetary relief paid directly to him. *See LaRue*, 128 S. Ct. at 1026. The recovery is obtained by the plan — even if it is for injury only to a particular individual account — because the aggregation of individual accounts defines the assets of the plan. *See* 29 U.S.C. § 1002(34). As the Supreme Court explained, "fiduciary misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive." *Id.* at 1025. It is sufficient that "a fiduciary breach diminishes plan assets payable to all participants and beneficiaries, or only to persons tied to particular individual accounts." *Id.*

The defendants' argument that restoration of individual accounts would be speculative following any recovery in these cases thus fails to recognize that in a defined contribution plan, it is the plan assets *in the individual accounts* that are restored — less, of course, fees and expenses incurred. Accordingly, the redressability problem that arises in defined benefit plans does not exist with respect to defined contribution plans.[4]

Finally, we should note that while the *LaRue* Court only decided statutory standing in its opinion, it did not ignore constitutional stand-

---

[4]The defendants argue in addition that the Securities and Exchange Commission settlements with respect to mutual fund market timing have given plan fiduciaries the option not to allocate settlement proceeds to cashed-out former employees, such as the plaintiffs, evidencing the fiduciaries' unbridled discretion. But the SEC's settlements are matters of negotiated contracts that are not binding here, especially in view of the Supreme Court's *LaRue* opinion, where the Court relied on the fact that a defined contribution plan "promises the participant the value of an individual account at retirement" and that any fraud that diminishes the value of the participant's individual account is a harm for which ERISA provides a remedy *to the plan for the participant*.

ing, nor could it have ruled on statutory standing had the requirements of constitutional standing not been satisfied. In a motion to dismiss filed in the Supreme Court, the *LaRue* defendants argued that the case had become moot because the plaintiff failed to meet the redressability prong of constitutional standing. The defendants based their argument on the fact that because the plaintiff had voluntarily taken a full distribution of the amount in his individual account within the defined contribution plan, he lost his status as a plan participant. *See* Motion to Dismiss the Writ of Certiorari at 4, *LaRue*, 128 S. Ct. 1020 (2008) (No. 06-856), 2007 WL 3231419 at *4. In responding to this argument, the Supreme Court stated that while the plaintiff's "withdrawal of funds from the Plan may have relevance to the proceedings on remand, we denied [the defendants'] motion *because the case is not moot*," *LaRue*, 128 S. Ct. at 1026 n.6 (emphasis added), noting that "[a] plan 'participant,' as defined by § 3(7) of ERISA, 29 U.S.C. § 1002(7), may include a former employee with a colorable claim for benefits," *id.* (citing *Harzewski*, 489 F.3d at 799, with approval).[5] Thus, even though the Court did not decide constitutional standing in its published opinion, it clearly manifested its belief that the plaintiff there — a cashed-out former employee — had suffered an injury that could be redressed by the court. This was necessary, since "such a jurisdictional defect [as the lack of constitutional standing] deprives not only the initial court but also the appellate court of its power over the case or controversy." *Freytag v. Comm'r*, 501 U.S. 868, 896 (1991) (Scalia, J., concurring).

In sum, if we take the plaintiffs' cases as they come to us and therefore accept for now the allegations of the complaints as true — that the defendants breached fiduciary obligations imposed by ERISA § 409(a) and those breaches had an adverse impact on the value of the plan assets in the plaintiffs' individual accounts — then the plaintiffs have constitutional standing to bring these claims. Because we find

---

[5]Here, too, the "withdrawal of funds from the Plan may have relevance to the proceedings on remand." *LaRue*, 128 S. Ct. at 1026 n.6. For example, should the plaintiffs prevail, the amount withdrawn may be a factor in determining the additional amount to which the participant is entitled to receive above what has already been received, as the date and time of withdrawal may have influenced the extent of the various plaintiffs' injuries.

both statutory standing and constitutional standing in the assumed circumstances of these cases, we reverse the judgments of the district court and remand for further proceedings.

*REVERSED AND REMANDED*