**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CGM, LLC,

$\qquad$ *Plaintiff-Appellant,*

v.

BELLSOUTH TELECOMMUNICATIONS, INCORPORATED; AT&T BILLING SOUTHEAST, LLC, a/k/a AT&T Billing Southeast, Inc.; AT&T CORPORATION,

$\qquad$ *Defendants-Appellees.*

No. 10-1693

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:09-cv-00377-RJC-DCK)

Argued: September 20, 2011

Decided: December 8, 2011

Before SHEDD and WYNN, Circuit Judges, and
Damon J. KEITH, Senior Circuit Judge of the United States
Court of Appeals for the Sixth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Shedd and Senior Judge Keith concurred.

**COUNSEL**

**ARGUED:** Ira Thane Kasdan, KELLEY, DRYE & WAR-REN, LLP, Washington, D.C., for Appellant. Dennis Friedman, MAYER BROWN, LLP, Chicago, Illinois, for Appellees. **ON BRIEF:** Barbara A. Miller, KELLEY, DRYE & WARREN, LLP, Washington, D.C., for Appellant. Patrick W. Turner, AT&T SOUTH CAROLINA, Columbia, South Carolina; Jeffrey M. Strauss, MAYER BROWN, LLP, Chicago, Illinois, for Appellees.

---

**OPINION**

WYNN, Circuit Judge:

"The Telecommunications Act of 1996 . . . represents a comprehensive effort by Congress to bring the benefits of deregulation and competition to all aspects of the telecommunications market in the United States, including especially local markets." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 391 (7th Cir. 2000). The 1996 Act imposes new duties on incumbent local telecommunications carriers, which had previously enjoyed monopolies in local telecommunications markets; those duties include the duty to sell telecommunications services at wholesale rates to would-be competitors for resale to consumers.

In this case, CGM, LLC, a billing agent for competitive local exchange carriers ("competitive LECs"), brought a declaratory judgment action against BellSouth Telecommunications, Inc., an incumbent local exchange carrier ("incumbent LEC"). CGM claimed that BellSouth offered long-term promotional discounts to its own customers but failed, in violation of the 1996 Act and rules implementing it, to pass the full value of those discounts on to CGM's client competitive LECs, none of which is a party to this suit.

Because CGM has no statutory standing under either the 1996 Act or a seemingly broadly worded but nonetheless inapplicable statute from the Federal Telecommunications Act of 1934, we affirm the district court's dismissal of CGM's complaint.

I.

In an effort to introduce competition into local telephone markets, Congress enacted the 1996 Act, which amended and supplemented the 1934 Act. *See BellSouth Telecomms., Inc. v. Sanford*, 494 F.3d 439, 441, 444 (4th Cir. 2007). The 1996 Act requires, among other things, that large telephone companies with existing telecommunications infrastructure share that infrastructure with their smaller competitors. Upon request, the incumbent LECs must provide network access to their competitors, the competitive LECs. *Id.* at 444-45; 47 U.S.C. § 251(c)(2).

In connection with the mandate to provide competitive LECs with access, the 1996 Act also requires incumbent LECs to offer competitive LECs "resale at wholesale rates any telecommunications service that the [incumbent LEC] provides at retail to subscribers who are not telecommunications carriers . . . ." *Id.* § 251(c)(4). Put differently, competitive LECs may purchase services from incumbent LECs at a discounted rate and then resell those services to individual customers at market rates.

To implement the provisions of the 1996 Act, the Federal Communications Commission ("FCC") promulgated regulations. *See* 47 C.F.R. § 51.1. Under those regulations, the "resale duty" extends to promotional offers incumbent LECs provide to their retail customers lasting longer than ninety days. 47 C.F.R. § 51.613(a). 47 C.F.R. § 51.613(a) prevents incumbent LECs from devising retail promotional schemes enabling them to offer discounts to their retail customers without extending the value of those discounts to competitive LECs.

The terms and conditions of the access arrangements between incumbent LECs and competitive LECs are developed through private contracts know as "interconnection agreements." 47 U.S.C. § 252; *Verizon Md., Inc. v. Global NAPs, Inc.*, 377 F.3d 355, 364 (4th Cir. 2004). Interconnection agreements can be reached through voluntary negotiation or compulsory arbitration, but regardless of whether negotiated or arbitrated, all interconnection agreements must be submitted to and approved by the appropriate state utilities commissions. *Id.*; 47 U.S.C. § 252(e).[1]

Interconnection agreements, not the general duties mentioned in Section 251(c), govern incumbent LECs' 1996 Act resale duties. In other words, "section 251(c)'s obligations are not generally self-executing. Rather, incumbents are required to implement them through voluntary good-faith negotiations with prospective entrants . . . ." Peter W. Huber et al., *Federal Telecommunications Law* § 5.6.2 (2d ed. Supp. 2011); *cf. Verizon Md.*, 377 F.3d at 364 ("Once the [interconnection agreement] is approved, the 1996 Act requires the parties to abide by its terms. Interconnection agreements are thus the vehicles chosen by Congress to implement the duties imposed in § 251." (internal citation omitted)).

BellSouth provides local exchange telephone service in a nine-state region in the southeastern United States.[2] In each of

---

[1]The nature of the review varies, however, depending on whether the interconnection agreement has been negotiated or arbitrated. Negotiated agreements are reviewed simply to ensure that the interconnection agreement does not discriminate against a non-party carrier and that the interconnection agreement is not inconsistent with the public interest, convenience, or necessity. 47 U.S.C. § 252(e)(2). By contrast, an arbitrated agreement is reviewed to ensure its conformity with the requirements of Section 251. *Id.*

[2]AT&T Corp. and AT&T Billing Southeast, LLC are affiliates of Bell-South. Because there are no issues on appeal that specifically relate to either AT&T Corp. or AT&T Billing, we generally refer only to Bell-South.

those states, BellSouth operates as an incumbent LEC. CGM is a billing agent for certain unidentified competitive LEC resellers of BellSouth telecommunications services in the nine-state BellSouth region. CGM itself, however, provides no telecommunications services.

CGM is neither an incumbent LEC nor a competitive LEC and does not assert that it is a party to an interconnection agreement. Nevertheless, in 2009, CGM filed a "Complaint for Expedited Declaratory Judgment" in the Western District of North Carolina. J.A. 10. CGM is the only named plaintiff, and nothing in the record indicates that CGM was authorized to bring, or was in fact bringing, its suit on behalf of anyone other than itself. CGM's primary grievance: BellSouth is overcharging for its services to competitive LECs in violation of 47 U.S.C. § 251(c)(4) and 47 C.F.R. § 51.613(a). Specifically, CGM contends that BellSouth provided cash-back promotions to its retail customers but provided CGM's competitive LEC clients with only around eighty percent of the value of those promotions. CGM argues that, absent a contrary determination by the applicable state utilities commission, the competitive LECs are entitled to the full value of those promotions.

Significantly, CGM does not contend that BellSouth owes it money directly. Instead, CGM maintains that BellSouth owes CGM's competitive LEC customers over $14 million as a consequence of this overcharging dispute.[3] According to CGM, those competitive LECs in turn owe CGM over $360,000 in fees. This is because CGM is paid by its client competitive LECs based in part on the amount of money that CGM obtains for the competitive LECs from "Credits/Rebates/Cashbacks/Winbacks/Offsets" that BellSouth pro-

---

[3]We note that CGM also alleged in its complaint that "the total amount of money currently in dispute is approximately $10.9 million . . . ." J.A. 16. For purposes of our analysis, however, the precise amount is irrelevant.

vides to its retail customers and is thus obligated to pass on to the competitive LECs. J.A. 12. In its complaint, CGM primarily seeks a declaratory judgment that BellSouth "must credit the CGM [competitive LECs] the full, dollar for dollar, value of the credit offered to BellSouth's retail customers in the absence, as here, of [its] having first proved to the appropriate regulatory body that [its] contrary practice to date is reasonable and nondiscriminatory as required by *Sanford* and 47 C.F.R. § 51.613(b) . . . ." J.A. 17.

In response, BellSouth filed a motion to dismiss CGM's complaint under Federal Rule of Civil Procedure 12(b)(6). BellSouth argued that CGM lacks standing to assert its claims and that it fails to state a claim upon which relief can be granted. With regard to standing specifically, BellSouth contended that the pertinent inquiry is "'whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" J.A. 70 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). BellSouth maintained that "[i]t is not sufficient to allege—as CGM does (Opp. 6 n.5)—that the defendant is the 'but for' cause of some alleged injury. The plaintiff must have a basis for seeking redress under the statute on which the claim rests. . . . CGM has no rights under the 1996 Act; it thus also lacks 'standing' to sue . . . ." J.A. 204.

A magistrate judge issued a memorandum and recommendation to grant BellSouth's motion, to which CGM objected. Nevertheless, the district court granted BellSouth's motion to dismiss on the basis that CGM lacked standing to bring its claims. In essence, the district court held that the 1996 Act granted rights and obligations to specific parties and created a particular framework within which those parties may assert violations of those rights and obligations. Because CGM is not a party with rights under the 1996 Act, it has no standing to assert its claims, which are based on alleged violations of duties arising under the 1996 Act. And the district court determined that a general redress provision in the 1934 Act pro-

vided no lifeline to CGM's failed claims. The district court further held that the Declaratory Judgments Act provided no independent basis for CGM's suit. CGM appealed.

II.

We review de novo the district court's grant of BellSouth's motion to dismiss. *Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006). When ruling on a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Further, "like the district court, [we] draw all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

The district dismissed under Civil Procedure Rule 12(b)(6), that is, for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). However, in its decision, the district court focused on standing, which is generally associated with Civil Procedure Rule 12(b)(1) pertaining to subject matter jurisdiction. *See, e.g.*, *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). That is because "Article III gives federal courts jurisdiction only over cases and controversies," and standing is "an integral component of the case or controversy requirement." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (internal quotation marks omitted).

Nevertheless, the district court correctly focused on Civil Procedure Rule 12(b)(6) because the standing inquiry at the heart of this case is statutory standing—a concept distinct from Article III and prudential standing. And typically, "[a] dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73 (3d Cir. 2011). *See also Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1024 (9th Cir. 2009) ("[A] dismissal for lack of statutory standing

is properly viewed as a dismissal for failure to state a claim rather than a dismissal for lack of subject matter jurisdiction.").

## A.

Constitutional standing and prudential standing are well-covered ground. To possess constitutional standing, a plaintiff must be injured by the defendant, and a federal court must be able to redress the injury. *See, e.g.*, *In re Mutual Funds Inv. Litig.*, 529 F.3d 207, 216 (4th Cir. 2008). Prudential standing encompasses several judicially-created limits on federal jurisdiction, "such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Less well-known is the concept of statutory standing, which is perhaps best understood as not even standing at all. Statutory standing "applies only to legislatively-created causes of action" and concerns "whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action." Radha A. Pathak, *Statutory Standing and the Tyranny of Labels*, 62 Okla. L. Rev. 89, 91 (2009). This Court has framed the statutory standing inquiry as whether the plaintiff "is a member of the class given authority by a statute to bring suit . . . ." *In re Mutual Funds*, 529 F.3d at 216 (examining "statutory standing" under ERISA separately from Article III standing and deeming statutory standing to exist). As the Third Circuit summed it up in *Graden v. Conexant Sys., Inc.*:

> Though all are termed "standing," the differences between statutory, constitutional, and prudential standing are important. Constitutional and prudential standing are about, respectively, the constitutional

power of a federal court to resolve a dispute and the wisdom of so doing. Statutory standing is simply statutory interpretation: the question it asks is whether Congress has accorded *this* injured plaintiff the right to sue the defendant to redress his injury.

496 F.3d 291, 295 (3d Cir. 2007) (internal citations omitted).

In a case where the question is "whether Congress intended to confer standing on a litigant like [the one at bar] to bring an action under [the statute at issue]", "[o]ur task is essentially one of statutory construction." *Washington-Dulles Transp., Ltd. v. Metro. Washington Airports Auth.*, 263 F.3d 371, 377 (4th Cir. 2001). "Normally, where the statutory language provides a clear answer, our analysis begins and ends with that language." *Wilmington Shipping Co. v. New Eng. Life Ins. Co.*, 496 F.3d 326, 339 (4th Cir. 2007). In the face of ambiguities, we then look to legislative intent. *Id.*; *see also Graden*, 496 F.3d at 295 ("[W]e employ the usual tools of statutory interpretation. We look first at the text of the statute and then, if ambiguous, to other indicia of congressional intent such as the legislative history.").

## III.

### A.

In this appeal, CGM argues that it has standing under the 1934 Act to challenge BellSouth's alleged failure to comply with the 1996 Act. CGM relies specifically on 47 U.S.C. § 401(b), which states in pertinent part:

If any person fails or neglects to obey any order of the [FCC] other than for the payment of money, while the same is in effect, the [FCC] or any party injured thereby . . . may apply to the appropriate district court of the United States for the enforcement of such order.

*Id.*

The term "order" is not defined, and there is disagreement amongst the circuits as to what constitutes an "order" for Section 401(b) purposes. The First Circuit, in an opinion authored by then-Judge, now-Justice Breyer, has held that Section 401(b) may be used to enforce only orders that emanate from the FCC's adjudicatory process. *New Eng. Tel. & Tel. Co. v. Pub. Utils. Comm'n of Me.*, 742 F.2d 1, 4–7 (1st Cir. 1984). Adjudicatory orders are party-specific and "'concerned with the determination of past and present rights and liabilities.'" *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (quoting with approval the 1947 Attorney General's Manual on the Administrative Procedure Act). The First Circuit held that Section 401(b) may not be used to enforce FCC orders promulgated through the Commission's rulemaking process. *New Eng. Tel. & Tel.*, 742 F.2d at 4–7. Rulemaking orders are general and "focus on policy considerations and results . . . ." *San Juan Cable LLC v. Puerto Rico Tel. Co., Inc.*, 612 F.3d 25, 33 n.3 (1st Cir. 2010).

By contrast, other circuits have held that a rule resulting from a rulemaking proceeding can be considered an order for purposes of Section 401(b). *See, e.g.*, *Hawaiian Tel. Co. v. Public Utils. Comm'n*, 827 F.2d 1264, 1270-72 (9th Cir. 1987). *See also Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n*, 748 F.2d 879, 881 (4th Cir. 1984), *vacated and remanded*, 476 U.S. 445 (1986). Those circuits, in other words, do not limit Section 401(b)'s application to adjudicatory orders. Notably, however, even courts that have taken a more expansive view of the term "order" have indicated that private enforcement actions under Section 401(b) are available only when the order or rule at issue "requires a defendant to take concrete actions." *Mallenbaum v. Adelphia Commc'ns Corp.*, 74 F.3d 465, 468 (3d Cir. 1996). *See also Hawaiian Tel.*, 827 F.2d at 1272 ("The language of the particular order in question, and the proceedings leading up to it, demonstrate that the FCC intended [it] to require particular actions be

taken by the [defendant] . . . . Under the circumstances, we conclude that [the FCC order at issue] was appropriately interpreted as an 'order' for enforcement by injunction in the district court."). Private enforcement is thus improper when a rule or order is unrelated to specific rights or obligations of the litigants and is thus "more akin to a general rulemaking than to an order . . . ." *Mallenbaum*, 74 F.3d at 469.

In this case, the FCC "orders" on which CGM seeks to rely are the "Local Competition Order," In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499, 1996 WL 452885 (Aug. 8, 1996), and 47 C.F.R. § 51.613. The Local Competition Order is a general "First Report and Order" laying out policy considerations, public feedback, and promulgating rules. *Id.* It cannot accurately be characterized as setting out specific rights and obligations of these litigants any more so than 47 C.F.R. § 51.613, which was promulgated in the Local Competition Order. *See Mallenbaum*, 74 F.3d at 469.

Further, the Local Competition Order suggests that neither it nor 47 C.F.R. § 51.613 can support CGM's standing claim. The Local Competition Order makes clear, for example, that the rules regarding discount and promotion restrictions are "best left to state commissions, which are more familiar with the particular business practices of their incumbent LECs and local market conditions." Local Competition Order, 1996 WL 452885, at *277. Further, in the Local Competition Order, the FCC "emphasize[d] that, under the statute, parties may voluntarily negotiate agreements *'without regard to' the rules that we establish* under sections 251(b) and (c)." *Id.*, at *18 (emphasis added). Therefore, in regulating the 1996 Act, the FCC established a flexible framework to match the flexibility that Congress embedded in the 1996 Act itself.

In the 1996 Act at 47 U.S.C § 251(c), Congress set out incumbent LEC obligations to resell telecommunications ser-

vices at discounted rates. Notably, Congress made clear in the very next section of the 1996 Act that "an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting [competitive LEC or competitive LECs] *without regard to the standards set forth in subsections (b) and (c) of section 251 of this title*." 47 U.S.C § 252(a) (emphasis added). In other words, Congress expressly allowed incumbent LECs and competitive LECs entering into negotiated (as opposed to arbitrated) interconnection agreements to contract freely around the resale obligations.[4] *See, e.g.*, *Federal Telecommunications Law* § 5.6.2 ("the statute expressly permits the negotiating parties to reach agreement 'without regard' to any specific statutory obligations"); *SBC Commc'ns Inc. v. FCC*, 407 F.3d 1223, 1226 (D.C. Cir. 2005) ("The Act also makes clear that [incumbent LECs and competitive LECs] may enter [interconnection agreements] that differ from the unbundling requirements of §§ 251(b) or (c). *See id.* at § 252(a)(1)."); *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atlantic Corp.*, 305 F.3d 89, 104 (2d Cir. 2002) ("[T]he fact that the Telecommunications Act allows parties to negotiate interconnection agreements without regard to subsections (b) and (c) of section 251 indicates that Congress envisioned the possibility that the negotiated parts of the interconnection agreement could result in a different set of duties than those defined by the statute." (internal citation omitted)), *rev'd on other grounds*, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

---

[4]This Court's opinion in *AT&T Commc'ns of the S. States, Inc. v. Bell-South Telecomms., Inc.*, 229 F.3d 457 (2000), in no way holds otherwise—nor could it, in the face of the clear statutory language. Instead, in that opinion, we simply noted that interconnection agreement provisions that are "not arbitrated are also not necessarily negotiated 'without regard to the standards set forth in'" Section 251. *Id.* at 465. "In other words, some provisions may be negotiated and agreed upon 'with regard' to the 1996 Act and law thereunder . . . ." *Id.*

Indeed, 47 C.F.R. § 51.613, upon which CGM seeks to rely for purposes of Section 401(b) standing, goes to these wide-open resale obligations. The regulation, titled "Restrictions on resale," provides additional detail regarding the resale duty addressed in Section 251(c). 47 C.F.R. § 51.613(a). Given that Congress expressly allowed negotiating parties to contract around Section 251(c)'s resale obligations, and given that the FCC specifically "emphasize[d]" that "parties may voluntarily negotiate agreements 'without regard to' the rules that we establish under sections 251(b) and (c)", we cannot read 47 C.F.R. § 51.613 as an order setting out specific rights or obligations of these litigants. We find it telling that, for all we know (based on CGM's nonspecific allegations), every one of CGM's competitive LEC customers could have a negotiated interconnection agreement that exempts BellSouth from many of Section 251(c)'s resale requirements and the related 47 C.F.R. § 51.613 regulation. Under such circumstances, BellSouth would have no obligations—and CGM, certainly, no rights. Consequently, 47 C.F.R. § 51.613 is not an order for Section 401(b) purposes and cannot provide CGM with standing. *See Mallenbaum*, 74 F.3d at 469.

Further, the obligations set out in Section 251(c) are not free-standing; instead, they exist only to the extent a competitive LEC and incumbent LEC enter into an interconnection agreement. "For companies that are subject to them, section 251(c)'s obligations are generally not self-executing. Rather, incumbents are required to implement them through voluntary good-faith negotiations with prospective entrants . . . ." *Federal Telecommunications Law* § 5.6.2. Stated differently, "[w]hile the duties regulating [incumbent LECs] enumerated in subsections (b) and (c) of section 251 appear at first glance to be free-standing, in practice, section 251 envisions that these duties will be implemented through state approved contracts between the carrier requesting interconnection and the [incumbent LEC]." *Trinko*, 305 F.3d at 103. *See also Verizon Md.*, 377 F.3d at 364 ("Interconnection agreements are thus

the vehicles chosen by Congress to implement the duties imposed in § 251.").

Again, CGM has no interconnection agreement with Bell-South. CGM has not brought this suit pursuant to any interconnection agreement. And no party to an interconnection agreement is a plaintiff in CGM's suit. Because Section 251(c)'s resale duties and the related 47 C.F.R. § 51.613 are not free-standing but exist, to the extent that they do at all (given parties' freedom to contract around them), only as embodied in interconnection agreements, CGM has no rights, and BellSouth no duties, under the circumstances of this case.

## B.

CGM also asserts that it has standing under the Declaratory Judgments Act, 28 U.S.C. § 2201. That act, however, is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950); *Volvo GM Heavy Truck Corp. v. U.S. Dep't of Labor*, 118 F.3d 205, 210 (4th Cir. 1997). Stated differently, "[a] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred." *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 108 F.3d 658, 668 (6th Cir. 1997). Here, CGM's substantive claims fail. Accordingly, so must its Declaratory Judgments Act claim.

## IV.

At the end of the day, CGM seeks to shoehorn claims against its own competitive LEC clients into a claim against BellSouth. In reality, CGM appears to complain that its own client competitive LECs have failed to enforce their rights under the 1996 Act against BellSouth. Yet neither the 1996 Act nor a seemingly broadly worded but nonetheless inapplicable statute from the Federal Telecommunications Act of

1934 provides statutory standing for CGM to bring this action against Bellsouth. Accordingly, we hold that the district court properly dismissed this case.

*AFFIRMED*